# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MUHAMMAD MUHAMMAD and JEREMY MISKELLA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>GENERAL MOTORS LLC, a Delaware corporation.<br><br>    Defendant. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Muhammad Muhammad and Jeremy Miskella, individually and on behalf of all others similarly situated, bring this class action lawsuit against Defendant General Motors LLC ("GM" or "Defendant") based on their counsel's investigation and their personal knowledge and allege as follows:

## INTRODUCTION

1.     This class action arises from General Motors LLC's failure to disclose a dangerous and widespread defect in the L87 6.2L V8 engine ("L87 Engine"), which renders numerous GM vehicles unsafe, unreliable, and subject to catastrophic engine failure. The defect affects hundreds of thousands of GM vehicles manufactured between 2021 and 2024, including the Chevrolet Silverado 1500 (2021–2024), Chevrolet Tahoe (2021–2024), Chevrolet Suburban (2021–2024), GMC Sierra 1500 (2021–2024), GMC Yukon (2021-2024), GMC Yukon XL (2021–2024), Cadillac Escalade (2021-2024), and Cadillac Escalade ESV (2021–2024) (collectively, the "Class Vehicles").

2.     The engine defect results from internal mechanical failures—including improperly machined crankshafts, defective connecting rods, oil contamination, and inadequate bearing tolerances—that cause severe internal damage, excess oil consumption, loss of engine power, and, in many cases, complete engine failure (the "Engine Defect"). These failures often occur without warning and well within the warranty period, posing a significant safety risk to drivers and passengers.

3.    GM should have been aware of the Engine Defect since at least December 2021, when it updated Technical Service Bulletin 19-NA-218 to address issues with the L87 Engine's valvetrain components. Subsequent internal analyses and investigations confirmed serious manufacturing and assembly flaws in the L87 Engine. Despite this knowledge, GM did not disclose to consumers that the L87 Engine was defective, nor did it issue a formal recall until over three years later.

4.    On January 17, 2025, the National Highway Traffic Safety Administration ("NHTSA") opened a preliminary investigation due to mounting reports of sudden, catastrophic engine failures in the Class Vehicles. NHTSA identified over 877,000 affected vehicles, citing serious safety concerns and a lack of advanced warning to drivers prior to engine failure.

5.    GM responded to NHTSA's inquiry by claiming it was initiating its own internal investigation in January 2025. That investigation culminated in a safety recall, issued on April 24, 2025, covering approximately 597,630 Class Vehicles. GM admitted in Safety Recall Report No. 25V-274 that manufacturing defects involving the crankshaft, connecting rods, and engine bearings could result in total engine failure increasing the risk of a crash. GM also admitted that it had closed three previous investigations into the defect in February 2022, June 2023, and July 2024. In connection with the April 24, 2025, recall, GM dealers are required to inspect the Class Vehicles for diagnostic code P0016, indicating

misalignment between the crankshaft and camshaft. Vehicles with that diagnostic code and that do not pass inspection will be quarantined for future engine repair or replacement. Owners of Class Vehicles that supposedly pass inspection will receive a higher viscosity oil, a new oil fill cap, and an owner's manual insert—a measure that does not address the underlying mechanical defect.

6.     GM also issued a stop-sale order in a dealer bulletin. Specifically, the dealer bulletin states, "All involved vehicles that are in dealer inventory must be held and not delivered to customers, dealer traded, or used for demonstration purposes" until the vehicles has been repaired.[1]

7.     As to GM's so-called "oil remedy," it is not clear that it will address the underlying manufacturing flaws but what is clear is that it imposes additional costs and burdens on consumers. The use of a thicker and substantially higher viscosity oil like 0W-40 rather than the originally specified viscosity 0W-20 oil results in reduced fuel economy because a more viscous oil requires more energy to pump the oil through the engine, which translates into more fuel consumption.[2]

---

[1] *See* https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-5347.pdf
[2] *See,* Artur Wolak, et al., *Does Engine Oil Type Affect Fuel Consumption in Passenger Vehicles? A Two-Year Investigation* (May 21, 2024), at https://www.mdpi.com/1996-1073/17/11/2458; Milton Tobar, et al., *The Impact of Oil Viscosity and Fuel Quality on Internal Combustion Engine Performance and Emissions: An Experimental Approach* (Mar. 22, 2025), at https://www.mdpi.com/2075-4442/13/4/188

Consumers are now forced to bear the resulting increased fuel costs, while still operating vehicles with potentially defective engines.

8.      Recall notices are not scheduled for mailing to consumers until June 9, 2025, and in the meantime, most Class Vehicle owners do not have a remedy. According to public reports and industry insiders, GM lacks sufficient supply of replacement engines to meet demand. Even before the recall, dealers struggled to secure replacement parts, leaving affected customers stranded for weeks or months. This may explain why GM has reportedly issued the stop-sale to authorized dealers for 2021-2024 model year Class Vehicles with the L87 Engine, a drastic measure that will make it difficult for owners who no longer want the Class Vehicles to sell them.

9.      Despite marketing the Class Vehicles with the L87 Engine as being more fuel efficient, as "dependable" and "reliable," GM has left its customers with a dangerous dilemma: stop using the vehicles for which they paid tens of thousands of dollars or continue driving them at the risk of sudden power loss or total engine failure. This choice is unacceptable for any consumer, let alone purchasers of high-end SUVs and heavy-duty trucks marketed as safe, durable, and fuel efficient.

10.     The adequacy of GM's recall remedy is, at best, uncertain. The so-called "fix" for vehicles that pass inspection—changing to a thicker oil—does not resolve the defect and merely shifts the burden onto owners to monitor oil integrity in an

inherently flawed engine. Even the full engine replacements offer no assurance, as GM has not confirmed whether every replacement engine will be free from defects.

11.     Moreover, by requiring the use of higher-viscosity oil, GM has introduced new harms. This change materially reduces fuel economy—potentially as much as 3–4%—and may further degrade performance in vehicles that rely on cylinder deactivation systems like Dynamic Fuel Management (DFM). Owners now face higher fuel costs, reduced resale value, and diminished performance, none of which were disclosed at the time of sale.

12.     As a result of GM's omissions and concealment, Plaintiffs, the proposed Class, and members of the public are now at risk of significant injury. Plaintiffs and the proposed Class have also suffered significant monetary harm: they overpaid for the Class Vehicles, which were advertised as rugged, reliable, durable, safe and fuel efficient, but in reality, are unsafe and dangerous. Moreover, the Class Vehicles now have diminished resale value. Plaintiffs and Class members will also face increased fuel consumption costs and will not receive the advertised fuel economy. GM has deprived Plaintiffs and Class members of the benefit of their bargain by delivering vehicles equipped with the defective L87 Engine, have diminished resale value, and that do not provide the advertised performance.

13.     Plaintiffs, individually and on behalf of all others similarly situated, bring claims against GM for fraudulent concealment/omission, negligent

omission/concealment, unjust enrichment, breach of implied warranty, and violations of various state consumer protection statutes. Plaintiffs seek all available monetary relief, including damages and all appropriate equitable relief.

## PARTIES

14.    Plaintiff Muhammad Muhammad is a resident and citizen of Philadelphia, Pennsylvania. Plaintiff Muhammad bought a certified pre-owned 2023 GMC Yukon Denali on January 29, 2025, for approximately $84,000 from Deacon Jones Chevrolet GMC of Kinston, North Carolina, an authorized GM dealership.

15.    Plaintiff Jeremy Miskella is a resident and citizen of Livermore, California. Plaintiff Miskella bought a new 2024 Chevrolet Silverado on March 1, 2024, for approximately $70,579.66 from Dublin Chevrolet Cadillac, an authorized GM dealership.

16.    Defendant General Motors LLC ("GM") is a Delaware corporation with its headquarters and principal place of business located in Detroit, Michigan. Defendant GM can be served with process through its agent The Corporation Company, 30600 Telegraph Road Ste. 2345, Bingham Farms, Michigan, 48025. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

17.     Defendant GM, through its various entities and brands, including Chevrolet, Cadillac and GMC, is in the business of designing, manufacturing, distributing, and selling GM-brand automobiles in this District, in the jurisdictions of the Named Plaintiffs' Class Vehicle purchases and/or leases, and in the jurisdictions of all U.S. states whose Class claims are iterated herein. GM and/or its agents designed, manufactured, and installed the L87 Engines in the Class Vehicles. GM also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles. GM also designed advertising material that it sent to GM dealerships for the purpose of having dealers distribute these to consumers, GM authorized dealers to communicate with consumers about the performance of the vehicles, and GM ensured that the dealership was a place where GM could disclose material facts to prospective buyers.

18.     GM maintains a parts distribution center in Langhorne, Pennsylvania, and is registered to do business in the state of Pennsylvania.

## JURISDICTION AND VENUE

19.     The amount in controversy in this matter exceeds $5,000,000, as each member of the proposed Class of thousands may be entitled to thousands of dollars in damages, exclusive of interest and costs.  Plaintiffs and GM are citizens of

different states.  Further, Plaintiffs identify a national class, which will result in at least one Class member belonging to a different state.  Therefore, both elements of diversity jurisdiction under the Class Action Fairness Act of 2005 ("CAFA")  are present, and this Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

20.    GM consented to general personal jurisdiction in courts in Pennsylvania by registering to do business in the state. 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b) (2019); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 128 (2023

21.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this case occurred in this District, and because GM's actions have caused harm to Class members residing in this District, including Plaintiff Muhammad Muhammad.

## FACTUAL ALLEGATIONS

### A.    Background

22.    General Motors markets and sells full-size pickup trucks and SUVs equipped with the L87 Engine under the Chevrolet, GMC, and Cadillac brands. The L87 Engine is offered across several of GM's highest-volume and most expensive vehicles, including the Chevrolet Silverado 1500 (2019–2024), Chevrolet Tahoe (2021-2024), Chevrolet Suburban (2021–2024), GMC Sierra 1500 (2019–2024), GMC Yukon (2021–2024), GMC Yukon XL (2021–2024), Cadillac Escalade (2021–2024), and Cadillac Escalade ESV (2021–2024).

23.    The L87 Engine is part of GM's EcoTec3 family of V8s and was introduced to replace the prior-generation L86 engine.[3] Unlike its predecessor, the L87 Engine incorporates cylinder deactivation through GM's Dynamic Fuel Management (DFM) system, which alternates firing sequences across 17 different cylinder patterns to improve fuel efficiency.[4] The L87 Engine also includes automatic start-stop functionality and was designed to meet consumer expectations for both performance and fuel economy.[5]

24.    The Class Vehicles are among GM's best-selling and most profitable models.[6] By the end of 2024, GM had sold or leased nearly one million Class Vehicles with the L87 Engine in the United States alone.[7]

25.    GM heavily promoted the L87-powered vehicles as "rugged," "dependable," "reliable," fuel efficient, and safe, positioning them as premium, durable options for daily drivers, commercial users, and adventure seekers alike.[8]

_____

[3] *See* https://gmauthority.com/blog/gm/gm-engines/l87/

[4] *See* https://gm-techlink.com/wp-content/uploads/2018/09/GM_TechLink_16_Mid-August_2018.pdf

[5] *See* https://poweredsolutions.gm.com/products/engines/l87-engine

[6] *See* https://gmauthority.com/blog/2025/04/the-chevy-silverado-was-the-best-selling-vehicle-in-these-eight-states-in-2024/

[7] *See* https://www.cbsnews.com/news/gm-recall-escalade-silverado-suburban-sierra-engine-failure-risk/

[8] *See* https://kunesgm.com/blog/2022-chevrolet-silverado-1500-ltd-rugged-reliable-and-feature-packed-pickup; https://www.gmc.com/content/dam/gmc/na/us/english/index/about/download-brochures/2023-models/02-

GM also touted the Class Vehicles' fuel economy and safety in its representations to consumers.[9] Through national advertising and dealership promotions, GM emphasized the L87 Engine's capability and longevity—suggesting it was an evolution of proven GM small-block engine technology enhancing fuel efficiency.[10]



With these comprehensive safety features, the Silverado 1500 LTD is a secure choice for both work and family use.

---

pdf/updated/GMTR23CT100_MY23_GMC_SIERRALD_DESKTOP_060623_IN
TERACTIVE.pdf; https://www.chevrolet.com/trucks/previous-
year/silverado/1500; https://poweredsolutions.gm.com/products/engines/l87-
engine

[9] *See* https://www.chevrolet.com/suvs/previous-year/suburban;
https://www.chevrolet.com/trucks/previous-year/silverado/1500; https://gm-
techlink.com/wp-content/uploads/2018/09/GM_TechLink_16_Mid-
August_2018.pdf

[10] *See* https://poweredsolutions.gm.com/products/engines/l87-engine

The L87 builds upon the previous 6.2L L86 with integral components for Automatic Start/Stop capability and available Dynamic Fuel Management (DFM) for even greater efficiency. Efficient, robust technologies including Direction Injection, Variable Valve Timing, oil-jet piston cooling, and a two-stage oil pump continue to be standard on L87.

26.    The L87 Engine features high-compression direct fuel injection, aluminum block construction, and electronically variable valve timing.[11] Its most distinctive feature is the cylinder deactivation system, which relies on a series of collapsible valve lifters and solenoids to deactivate individual cylinders under light-load conditions to conserve fuel.[12] GM marketed this system as seamless, efficient, and durable, offering improved fuel economy without sacrificing towing capacity or performance.[13]

27.    GM's chief engineer for small block engines explained that due to the DFM system being torque-based, "you've always got that satisfying feeling of power on demand that comes from GM's Gen V Small Block V-8 engines."[14]

––––––––––––––––––––

[11] *See* https://poweredsolutions.gm.com/products/engines/l87-engine

[12] *See* https://gmauthority.com/blog/gm/general-motors-technology/general-motors-propulsion-technology/general-motors-dynamic-fuel-management-cylinder-deactivation-technology/

[13] *See* https://poweredsolutions.gm.com/content/dam/gmpoweredsolutions/na/us/en/index/products/engines/l87-engine/02-pdfs/gm-powertrain-6.2-l-l87-engine-features-specifications.pdf

[14] *See* https://gmauthority.com/blog/gm/general-motors-technology/general-motors-propulsion-technology/general-motors-dynamic-fuel-management-cylinder-deactivation-technology/

28.    Yet GM's representations to consumers, however, were undercut by the undisclosed Engine Defect that plagued the Class Vehicles. Despite positioning the L87-powered trucks and SUVs as durable, fuel-efficient, and high-performance, GM sold vehicles with a latent and dangerous mechanical flaw that exposed owners to sudden engine failure, increased oil consumption, compromised performance, and increased operating costs. These defects directly contradicted GM's marketing claims and deprived consumers of the reliable, efficient driving experience they were promised.

**B.    The Engine Defect**

29.    In internal combustion vehicles, the engine is the central component, converting chemical energy from fuel into mechanical energy to power the vehicle. The L87 6.2L V8 engine, featured in GM's full-size trucks and SUVs, is designed to deliver high performance and efficiency. This engine was supposed to incorporate advanced technologies, including Dynamic Fuel Management (DFM), which deactivates certain cylinders under light-load conditions to improve fuel economy. However, the complexity of these systems also introduces potential points of failure.

30.    The L87 Engine's performance and efficiency heavily depend on the integrity of its internal components, particularly the crankshaft, connecting rods, and engine bearings. These components must withstand significant mechanical

stress and operate within precise tolerances. Any deviation in manufacturing specifications can lead to premature wear, loss of oil pressure, excess oil consumption and ultimately, catastrophic engine failure.

31.    The L87 Engine defect results from internal mechanical failures—including improperly machined crankshafts, defective connecting rods, oil contamination, and inadequate bearing tolerances—that cause severe internal damage, excess oil consumption, loss of engine power, and, in many cases, complete engine failure (the "Engine Defect").

32.    GM addressed the Engine Defect on April 24, 2025, announcing Safety Recall No. 25V-274 ("Recall Notice"), affecting approximately 597,630 vehicles equipped with the L87 Engine. The Recall Notice states that GM "began" investigating alleged engine failures in vehicles equipped with the L87 Engine on January 16, 2025, shortly after receiving inquiries from National Highway Traffic Safety Administration ("NHTSA"). However, the Recall Notice also indicates that GM had closed three previous investigations into the defect beginning with the first investigation in February 2022, with subsequent investigations in June 2023 and July 2024. GM's investigation identified 28,102 field complaints related to the Engine Defect and 14,332 cases of engine failure leading to loss of propulsion.[15]

---

[15] *See* https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF

33.    GM's investigation also identified 12 crashes and related injuries potentially attributable to the Engine Defect, as well as 42 potentially related engine fires. This is unsurprising, considering sudden loss of engine power at highway speeds poses a significant safety risk, increasing the likelihood of accidents and injuries to owners of the Class Vehicles—as GM acknowledges in the Recall Notice.

34.    GM revealed two primary root causes for the engine failure: "(1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out of specification crankshaft dimensions and surface finish."[16] In the Recall Notice, GM acknowledges that the defects with the connecting rods and crankshafts can lead to engine damage and failure without warning, posing a significant safety risk to drivers and passengers.

35.    GM issued the Recall Notice only after NHTSA initiated its own investigation, Preliminary Evaluation PE25-001, involving 877,000 vehicles, after NHTSA received dozens of complaints of sudden engine failures.[17] The NHTSA's Office of Defects Investigation received 39 complaints and a number of Early Warning Reporting field reports alleging engine failure in vehicles manufactured

---

[16] *See* https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF
[17] *See* https://static.nhtsa.gov/odi/inv/2025/INOA-PE25001-10002.pdf

by GM equipped with the L87 Engine.[18]

36.    The identified defects compromise the engine's structural integrity, leading to potential loss of propulsion, knocking and ticking sounds, increased oil consumption and engine failure—leading to an increased risk of accidents. Despite these serious concerns, in the Recall Notice, GM's initial remedy consists of an inspection to determine if a diagnostic trouble code DTC P0016 is present; if so, the engine may be replaced. If not, the dealer is instructed to change the oil to a higher-viscosity grade (0W-40), install a new oil cap, replace the oil filter, and provide an owner's manual insert—measures which do not address the root cause of the defect and which impose ongoing costs and performance trade-offs on the consumer.[19]

37.    The Engine Defect is so pervasive that GM has reportedly issued a stop-sale order on the Class Vehicles, a drastic measure that will no doubt cost GM substantial lost revenue.[20] If simply inspecting the vehicles and adding higher-

_____

[18] https://www.valerolaw.com/news/2025/1/20/nhtsa-investigation-into-general-motors-l87-engine-equipped-vehicles

[19] *See* https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF; https://www.thedrive.com/news/gm-owners-with-fixed-6-2l-v8s-sue-over-reduced-fuel-economy; https://www.drivenracingoil.com/blogs/news/the-impact-of-oil-viscosity-on-engine-performance?srsltid=AfmBOopfDgNibdfxGgRiI_ZLel3CYAa-h7PS6cpHHD1I5TTVqVW2Zbhh

[20] *See* https://www.caranddriver.com/news/a64611938/chevy-silverado-tahoe-cadillac-escalade-defective-v8-recall/

viscosity oil were a viable solution, GM would not have issued the stop-sale.

38.    GM's handling of the L87 Engine Defect raises serious concerns about the company's commitment to vehicle safety and transparency. The delayed recall and insufficient initial remedies have left owners at significant risk of bodily injury and have burdened them with increased fuel costs and unexpected out-of-pocket repair costs. Plaintiffs seek to hold GM accountable for these failures and to ensure that affected vehicle owners receive appropriate compensation and corrective measures.

### C.    Consumer Complaints Reveal the Magnitude of the Engine Defect.

39.    Below are just a few examples of the numerous complaints Class Vehicle owners and lessees have lodged with the National Highway Transportation Safety Administration ("NHTSA") regarding the Engine Defect:

- 2021 Chevrolet Silverado 1500: "The contact owns a 2021 Chevrolet Silverado 1500. The contact stated while driving 55 MPH, she heard abnormal knocking sounds coming from the engine. The contact veered to the side of the road inspected the vehicle but found no issues. The contact continued driving for a while before the failure recurred and the sound was much louder. The check engine warning light illuminated. The vehicle was towed to a local dealer to be diagnosed. The contact was informed that two

rods had gone through the engine block and the engine needed to be replaced. The vehicle was not repaired. The manufacturer was made aware of the failure. The failure mileage was approximately 6,000." (NHTSA ID Number: 11444064, Date Complaint Filed: 12/16/2021, Consumer Location: Kitty Hawk, NC).

- 2021 GMC Yukon XL: "While traveling at highway speeds, the vehicle suddenly and without warning lost power. All gauges remained in the normal range. After pulling on to the shoulder of a highway and turning the vehicle off, the vehicle would not start. After being towed the dealership, the vehicle would not power up. Dealership checked DTCS and found code P0016 Crankshaft Position Sensor and Intake/Single Camshaft Position Sensor Correlation. Dealership inspected wiring for chaffing and tested camshaft position sensor circuitry, and all found in normal condition. Dealership followed document ID: 5646662 diagnostic procedure inspecting camshaft position sensor and camshaft actuator solenoid valve for incorrect installation or damage. While inspecting, dealership found internal engine bearing material in oil indicating internal mechanical failure. Dealership removed engine oil pan and #1 and #2 connecting rods and found bearings spun

causing catastrophic engine failure. Crankshaft main bearing cap #3 also found discolored from extreme heat. Dealership then followed bulletin #22-NA-074 for replacement of engine oil, cooler lines and engine oil cooler after connecting rod and main bearing damage The vehicle only had 17,067 miles." (NHTSA ID Number: 11477035, Date Complaint Filed: 8/1/2022, Consumer Location: Corpus Christi, TX).

- 2023 Chevrolet Tahoe: "Car completely died. Engine spun a bearing at 10, 000 miles." (NHTSA ID Number: 11562182, Date Complaint Filed: 12/27/2023, Consumer Location: Pelham, NH).

- 2021 GMC Yukon: "Total engine failure due to bearing issues in the bottom half of the engine." (NHTSA ID Number: 11580224, Date Complaint Filed: 3/30/2024, Consumer Location: Unknown).

- 2022 GMC Sierra 1500 Limited: "The contact owns a 2022 GMC Sierra 1500. The contact stated that while driving at an undisclosed speed, he heard a knock sound coming from the engine compartment. No warning lights were illuminated. The vehicle was taken to the dealer, and during an inspection, the engine seized, after which the dealer diagnosed a failure with the rod bearings. The vehicle was repaired. The manufacturer was notified of the failure

but provided no assistance. The failure mileage was 31,000."
(NHTSA ID Number: 11585235, Date Complaint Filed: 4/25/2024,
Consumer Location: Conway, SC).

- 2021 GMC Sierra 1500: "The contact owns a 2021 GMC Sierra
  1500. The contact stated that while driving at an undisclosed speed,
  the vehicle failed to accelerate as needed and made an abnormal
  sound. The contact assumed that the sound was coming from the
  transmission and the vehicle was taken to a dealer. The dealer
  diagnosed the vehicle and suggested that the failure might be a
  pulley or a rod bearing failure. The contact took the vehicle to
  another dealer who confirmed a rod bearing failure. The
  manufacturer was not made aware of the failure. The vehicle was
  not repaired. The failure mileage was approximately 46,000."
  (NHTSA ID Number: 11592274, Date Complaint Filed: 6/3/2024,
  Consumer Location: Schertz, TX).

- 2022 GMC Sierra 1500 Limited: "Just got off the highway was at
  stop sign on exit ramp and it just died. No warnings no lights no
  indication that something was about to happen. No neutral so
  couldn't even push it out of the way of traffic. Had it towed to shop
  for diagnostic. Possible lifter problem. $600. Dealership towed it to

19

their shop. Engine tear down, lifters replaced. Gmc to pay 30%, dealership paying $1000, me $1300. Dealership started truck and the crank bearing spun. Now needs new engine, which are on back order. Cost ??? How long before engine available??? This is a known problem by the dealerships, GM & repair shops. Had we still been on the highway when this occurred doing 75mph we could have been killed." (NHTSA ID Number: 11597240, Date Complaint Filed: 6/27/2024, Consumer Location: Afton, MI).

- <u>2021 GMC Sierra 1500</u>: "The contact's husband owns a 2021 GMC Sierra 1500. The contact stated that while her husband was driving 80 MPH, the vehicle stalled. Additionally, the "Shift to Neutral and Restart" message blinked. The vehicle was steered to the side of the road where the vehicle failed to restart. The vehicle was towed to an independent mechanic where the failure was not able to be replicated. The vehicle was then towed to the dealer where it was suspected that the crankshaft bearing had seized, putting pressure on the starter, causing a short. The contact was informed that the engine needed to be taken apart for a proper diagnostic test. The vehicle was not repaired. The manufacturer was notified of the failure. The failure mileage was approximately 81,000." (NHTSA ID Number:

11614009, Date Complaint Filed: 9/11/2024, Consumer Location: Carneys Point, NJ).

- 2021 GMC Yukon: "I was driving 55 mph and the engine failed without any prior warning. I was partially blocking traffic while waiting for a tow truck. The car was taken to a repair facility and diagnosed. Spun rod bearings on cylinders 1 and 2 damaged the crankshaft. I purchased this car $49,000 45 days ago and have made one payment on a car that is not drivable and parts are not readily available. There is a GM service bulletin because this is a known issue but not a recall. The power train warranty is up by mileage not time. I contacted the dealership and GMC and they will not assist with repairs." (NHTSA ID Number: 11626737, Date Complaint Filed: 11/21/2024, Consumer Location: Howell, MI).

- 2020 Chevrolet Silverado 1500: "Main bearing on crankshaft when out." (NHTSA ID: 11630527, Date Complaint Filed: 12/13/2024, Consumer Location: Frisco City, AL).

- 2022 Chevrolet Silverado 1500 LTD: "GM has issue with Part restriction on the bottom end of the motor and rocker bearings going bad. No recalls on this just TSB. With that being said the motor blew a rod through the block because of the part restriction on the bottom

end of the motor. GM wont fix it because it just a TSB. GM states that this is an issue the customer needs to fix and to look out for these issues. Even though the bottom end of the restriction is a catastrophic failure when there motor fails. I was 20 MPH when the rod in the motor went through the block. Now I got a 50000 dollar paper weight I cant drive because GM refuses to fix there issue." (NHTSA ID Number: 11635919, Date Complaint Filed: 1/14/2025, Consumer Location: Springtown, TX).

- 2019 Chevrolet Silverado LD 1500: "Engine failed and had to be replaced because of bearing failure." (NHTSA ID Number: 11636561, Date Complaint Filed: 1/17/2025, Consumer Location: Richmond, MI).

- 2023 Chevrolet Silverado 1500: "There were no symptoms prior to the engine failure. On January 14th, 2025 while driving 58 miles per hour heard a sound that sounded like a slap on the back window. After the slap sound I noticed the engine was not running as normal. There was also a sound coming from the engine like metal rattling around. A few minutes later the check engine light appeared in the instrument panel. Had the vehicle towed to the nearest GM dealership and was informed that the thrust bearing went out which

may have caused damage to the crankshaft." (NHTSA ID Number: 11636439, Date Complaint Filed: 1/17/2025, Consumer Location: Monroe, MI).

- <u>2024 GMC Sierra 1500</u>: "Engine bearing failure, complete loss of power while driving and turning left into oncoming traffic. Bearing failure confirmed by GM Dealer, brass shavings in oil pan." (NHTSA ID Number: 11636622, Date Complaint Filed: 1/17/2025, Consumer Location: Jackson, MI).

- <u>2022 GMC Yukon XL</u>: "Engine failed on highway in a different state, was able to drive home but barely made it. 2 newborns, 2 toddlers, and 2 adults were all in the vehicle at the time the engine started squealing. No warning signs. Dealer dropped oil filter and it was full of metal. Official diagnosis was main crank thrust bearing failure. Rebuilt engine was installed under powertrain warranty (37500 miles). GM did not put us in a comparable rental vehicle, so I had to pay out of pocket expenses outside of their rental allowance for a compact car. Dealer charged for an oil change. Dealer changed the rebuilt engine warranty terms upon pickup from 3yr/100,000miles to 12mo/12,000 miles or the current terms of power train warranty, whichever was longer. GM is well aware of

this issue and is keeping it quiet. Rebuilt engines are on back order for months because it's that common of a failure." (NHTSA ID Number: 11636613, Date Complaint Filed: 1/17/2025, Consumer Location: Crown Point, IN).

- 2021 GMC Yukon XL: "Our 6.2L failed unexpectedly after regular maintenance. No warning, just the sound of knocking in the engine then loss of power and bad sounds from the engine. Stranded on side of road. GM wants to replace the entire engine without opening engine, claiming lower engine damage. Technicians say this is spun rod bearing problem that is very common. Dangerous and poor quality." (NHTSA ID Number: 11636676, Date Complaint Filed: 1/17/2025, Consumer Location: Oakton, VA).

- 2021 Chevrolet Silverado 1500: "Engine stopped working while driving on major highway. Coasted to stop on shoulder. Truck was towed to nearest Chevy dealer, Parkway Chevy, Tomball, TX ([XXX]). Diagnosed bearings failed, camshaft froze and engine valve damaged. After rude treatment by service agent and service manager, towed truck to original dealer in Conroe, TX-- Buckalew Chev/Keating Chev (Nov. 25, 2024). They confirmed problem and truck has been sitting at their dealership since Nov. 25, 2024 waiting

for re-mfgd engine. No timeline given for replacement. Bought another truck (Toyota Tundra -- [XXX]). INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636710, Date Complaint Filed: 1/18/2025, Consumer Location: Spring, TX).

- 2022 Chevrolet Silverado 1500 LTD: "In March of 2024 my 2022 Silverado with the 6.2L V8 suffered a catastrophic main crankshaft bearing failure resulting in the vehicle losing power on a local highway. I was able to coast the vehicle to the side of the road where it would not restart. GM replaced the engine under warranty. 8 months later (november of 2024) the same vehicle suffered a subsequent engine failure with similar symptoms but I haven't yet recieved the exact cause." (NHTSA ID Number: 11636827, Date Complaint Filed: 1/18/2025, Consumer Location: North Las Vegas, NV).

- 2024 Chevrolet Silverado 1500: "Vehicle spun a bearing in the lower part of the engine after 1147 miles of use." (NHTSA ID Number: 11636703, Date Complaint Filed: 1/18/2025, Consumer Location: Huntington, IN).

- <u>2023 GMC Yukon</u>: "I've had the engine blown and replaced twice. The first time it failed in the middle of an intersection. We could not put it in neutral to move it. We had to call a tow truck. No check engine lights just a noise. The engine had failed bc the bearings couldn't get oil. The second time it blew I was driving down the interstate and same thing only a noise so I pulled over and the car died. Also had to call a tow truck. It was the same as the first time the engine had blew because of the bearings not getting any oil. So now I'm on my third engine in a 2023, hoping that it doesn't do it again." (NHTSA ID Number: 11636779, Date Complaint Filed: 1/18/2025, Consumer Location: Burns Flat, OK).

- <u>2023 GMC Yukon</u>: "While passing on a two-lane road at approximately 70 MPH, the vehicle stalled and acted as if the engine wasn't running. Pulled over to the side of the road and was able to restart the engine after shifting to park. Engine was harder to start than usual and cranked slowly. After restarting, the engine ran fine for the remainder of the trip, but would occasionally have difficulty cranking. After this incident, the engine developed a knock that would vary with engine RPM, and sounded like a defective connecting rod bearing. Pulled the dipstick and noticed metal

26

shavings in the oil. Took the vehicle to local dealership who confirmed the engine was defective and would require replacement. Vehicle has been at the dealership since December 5th waiting for a backordered engine." (NHTSA ID Number: 11636784, Date Complaint Filed: 1/18/2025, Consumer Location: Rio Rancho, NM).

- 2021 GMC Yukon XL: "We were driving on the interstate outside of Chattanooga TN when our car went into neutral while we were in the left hand lane next to a 18 wheeler. My husband was driving and we have our four children and dog in the car. We lost acceleration. My husband was successful in getting us off the highway and onto the shoulder. The car started again and we tried to make it to the next exit when it went into neutral again and lost power. This was on [XXX]. We had it towed to the nearest dealer, Integrity Motors. They called us and said that it threw a rod and that the engine was broken and the whole engine would need to be replaced. After replacing the engine (it took 2 months) we picked the car up only to have the engine light come on. I took it to Autozone where they ran the codes and told me that the fuel injectors were bad and possibly the intake manifold gasket. I called Chattanooga and they told me

that I should take it to the nearest GMC dealer. Parks GMC in Greenville inspected the car and we had to put in 8 fuel injectors. I have documentation of all of these issues. There was no warning light or any warning that our engine was about to shut down. We could have been in a serious wreck with the 18 wheeler with possible loss of life or injury. We have had significant financial loss. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636704, Date Complaint Filed: 1/18/2025, Consumer Location: Unknown).

- 2021 GMC Yukon: "In July of 2024 while coming back from vacation pulling our boat our 2021 Yukon Denali with 6.2L motor started making noise while traveling on the interstate. I started to get over to the shoulder as the car lost power. I finally got it over to the shoulder as traffic was heavy and it was pouring down rain. As soon as I got it to the side of the road the check engine light came on and the engine died. It would not turn over or restart. After about 3 hours along side the very busy highway in bad weather GM finally sent a tow truck to take it to the dealer. After a week in a half it was finally diagnosed with spun rod bearings and main crankshaft bearings. The

car had just over 21,000 miles and had been serviced per the manufactures recommendations. It took over 7 weeks for the car to be repaired where they replaced the engine with a remanufactured engine. We did not get a loaner car since it happened in KY and we live in IN. Our family had to find our own way home and a way to get our boat home also. We then had to find our own way back to get the vehicle once it was repaired. GM did reimburse us for a rental car at $44 a day only and they did not pay any taxes or fees only the rental rate. You cannot rent a similar sized vehicle for $44 dollars a day. We spent approx. $2K out of our own pocket for expenses related to this breakdown. The vehicle now has approx. 29,000 miles on it and we have not had any problems since we got it back." (NHTSA ID Number: 11636742, Date Complaint Filed: 1/18/2025, Consumer Location: Plainfield, IN).

- 2023 Chevrolet Tahoe: "While sitting at an intersection of a busy 4 lane road the engine stoped without warning and could not be restarted. Due to a poor design by GM, the Tahoe has no ability to be put in neutral when the engine isn't running. We were stuck at a busy intersection an almost hit multiple times, until a tow truck could come since it cannot be put in neutral and pushed. Dealer

inspected engine and found it had been burning oil. The car never gave any warning lights that it was low on oil or that there were any engine issues. They did an oil change and gave the car back. The car was running, but within less than 5 miles of driving it it started to shake and make horrible noises. At this point, I was driving on the interstate. I was able to limp the vehicle back to the dealer. It was diagnosed by a dealer with spun engine bearing. I was told they were very close to seizing up and I would've been stranded on the interstate with no shoulder. This could've caused a major issue as I was on a busy interstate and the vehicle would've locked up. There was no shoulder at this point due to construction. Through both of these issues the vehicle never gave any dashboard warning lights. There are two major design flaws. The engine has an issue with its bearings. Also, there needs to be a way to put the vehicle into neutral while the engine is not running. It is not safe to not be able to put these vehicles into neutral." (NHTSA ID Number: 11636750, Date Complaint Filed: 1/18/2025, Consumer Location: Unknown).

- <u>2021 Chevrolet Silverado 1500</u>: "I was driving 65mph down the freeway when the truck suddenly turned off and the dash told me to put in neutral and start again so I did just that. Made it about another

mile and the truck completely turned off and wouldn't turn back on there was nowhere to pull over or get off the freeway in that time frame so I was stopped in the middle of the highway with my family in the truck. Luckily a guy in another truck was able to push me over to the shoulder with his vehicle where I sat and waited four hours for a tow to the dealership. Two days later they called me and told me it's spun a bearing and threw two rods and needed a new engine. I'm anal about servicing my vehicles they told me it just happens, but it was a brand new truck with only 35k miles. Ever since I got the new engine installed it's constantly squeaking and they can't seem to pin point the issues I feel like it's going to happen again and this next time I'll probably be out of warranty and it'll be out of pocket for me to fix." (NHTSA ID Number: 11636943, Date Complaint Filed: 1/19/2025, Consumer Location: Unknown).

- 2023 Chevrolet Suburban 1500: "While driving my family home from our christmas vacation on the Garden State Parkway (NJ) the engine shut off and would not restart. This happened on a stretch of the highway with no shoulder while traveling at 65mph. Thankfully we were able to coast far enough to a section of highway with a shoulder. This incident left my [XXX] , [XXX] , my wife and I and

our dog stranded in the freezing cold 100 miles from home. After a stressful next few days the Chevrolet dealership diagnosed it as blown bearings in the motor. It has now been over three weeks and no word from GM when a new motor will be available. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636860, Date Complaint Filed: 1/19/2025, Consumer Location: Basking Ridge, NJ).

- 2023 Chevrolet Tahoe: "On [XXX] while driving on the highway near Wash DC engine stopped, went to neutral. Would not start again. OnStar towed vehicle to Koons Chevrolet GMC Tyson in Vienna VA. 703 448 7221. On Tuesday Jan 7th, Koons Service Dept. looked at vehicle and determined that it was a thrown bearing and needed a new engine. There are 28,712 miles on vehicle. You can inspect if desired. Our safety was extremely compromised. We were on a 5 lane highway in the left hand lane going 65. Engine quit and we had to coast to the far right lane in heavy traffic. We almost got hit several times on the maneuver and rear ended on the side of the road from oncoming vehicles while waiting for a tow. Dealer has work order to fix the vehicle. Vehicle was not inspected by the

manufacturer that we know of, nor the police or insurance representatives. Only inspected by the dealership. The only symptom before the incident was a dull sound like a plastic bag being stuck in the grill for a few minutes before incident. The Service Department said the parts are on a "Galactic backorder" which means they do not know when they will come in. GM is extremely uncooperative in assisting us with this issue. They will not repurchase vehicle, will not put in writing why they wont repurchase it. Will not provide any compensation until the issue is resolved, which could be months. It is an extreme financial hardship for me to cover my rental car (taxes and insurance for the rental car are not covered) and continue to pay the car payment and the insurance on a car that is not available to me. My case number with GM is [XXX]. I need my loan payed off or a repurchase for the original value of my car so I can purchase another vehicle. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636869, Date Complaint Filed: 1/19/2025, Consumer Location: North Syracuse, NY).

- <u>2023 GMC Yukon</u>: "Yukon with 6.2 V8 suffered crankshaft bearing

failure. Vehicle had only 9800 miles on it. No warning. Vehicle shifted itself into neutral and engine shut off. Engine replaced under warranty." (NHTSA ID Number: 11636873, Date Complaint Filed: 1/19/2025, Consumer Location: Huntersville, NC).

- <u>2022 GMC Sierra 1500</u>: "My truck lost power while driving on the interstate.. had to restart while traffic moved around me.. truck eventually restarted and then again died while getting off exit ramp in traffic. Towed to Dealership and was diagnosed with a "blown" rod bearing. Full Engine replacement." (NHTSA ID Number: 11636878, Date Complaint Filed: 1/19/2025, Consumer Location: Clarkston, MI).

- <u>2022 Chevrolet Silverado 1500</u>: "I experienced rod bearing failure in my L87 6.2L engine at 27k miles. Luckily it didn't seize up while driving, but they did fail as I was driving home. Decided to report this after reading that it is becoming a common problem, but not a recall issue yet. GM is going to replace the engine, but there is no time frame whatsoever. I've seen people complaining about not having their repairs done for months at a time. I'm currently on week number two & counting." (NHTSA ID Number: 11636888, Date Complaint Filed: 1/19/2025, Consumer Location: Auburn, IN).

- <u>2022 GMC Yukon XL</u>: "At 45K miles my 2022 Yukon 6.2L suffered a total engine failure on [XXX] just South of Atlanta, GA in rush hour traffic. My vehicle was completely inoperable and shifted itself into neutral. I barely made it off the road without getting hit. GM had my vehicle over a month and stated it had crankshaft bearing failure. No engines are available on a nation wide back log with no estimate on availability so I'm forced to go another route out of pocket to repair my vehicle. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636933, Date Complaint Filed: 1/19/2025, Consumer Location: Jay, FL).

- <u>2022 Chevrolet Silverado 1500</u>: "-Bearing Failure -My Safety was put at Risk due to the vehicle instantaneously Stalling in the middle of a 4 Lane interstate without any prior warnings. -The vehicle has been diagnosed by 2 dealerships which both state that receiving a new engine is near to impossible due to this exact issue to be happening to a lot more of the same vehicles at the same time. So unfortunately they cannot confidently give me an ETA or anything in regards to my vehicle even being fixed. -Yes by 2 GM Mechanics

35

-No Warnings at all, the major concern is that there were no warnings at all. As well as leaving me stranded in the middle of a busy Interstate." (NHTSA ID Number: 11636946, Date Complaint Filed: 1/19/2025, Consumer Location: Belmont, NC).

- <u>2022 Cadiliac Escalade</u>: "Driving vehicle between 70-80 miles an hour on the freeway when the car switched into neutral and lost all engine power. No warning lamps or any indication of failure. I was able to steer vehicle to left side of freeway and it had to be towed. It was not a safe location as cars were flying by just feet from the dibbled vehicle. It never started again. Towed to local Cadillac and have been told the car experienced catastrophic engine failure." (NHTSA ID Number: 11636951, Date Complaint Filed: 1/19/2025, Consumer Location: Sanford, FL).

- <u>2022 Chevrolet Silverado 1500</u>: "The engine shutdown while I was driving on the highway. Vehicle accessory power was working but engine wouldn't start. Truck was towed to dealer for repair. Dealer is replacing motor." (NHTSA ID Number: 11636955, Date Complaint Filed: 1/19/2025, Consumer Location: Unknown).

- <u>2022 GMC Sierra 1500 LIMITED</u>: "bought vehicle in may 2022. had engine suddenly 'lock up' while driving on the highway to work

in november 2022. towed and repaired at gym dealer through december 2022 for 'spun bearing'. had 'fuel sensor' replaced in 10/23 when it failed the day before our planned fall break, towing our camper… then mid-december 2023 had camshaft part replacement when it 'locked up' again. got it back for 9 days when it once again 'locked up' (not driving this time…) and had engine completely replaced. on the first two occasions i was traveling at highway speed when all of a sudden- i lost power to the engine. thankfully i was on the shoulder side not towing anything either time!" (NHTSA ID Number: 11637928, Date Complaint Filed: 1/23/2025, Consumer Location: Knoxville, TN).

40.    The NHTSA complaints are also viewable online and searchable by NHTSA ID Number at https://www.nhtsa.gov/recalls.

41.    Class Vehicle owners have also posted complaints about the Engine Defect online:

- 2024 Sierra Denali: "I have a 2024 Sierra Denali truck with a 6.2L EcoTec3 engine. Twice while driving it, the engine stopped and the dash display said to the push start button to restart it, once while at a stop light and the other while in motion. Luckily, after the second failure, I was able to coast into a shopping center parking lot before

stopping. It never restarted. I had a tow truck take it to the nearest GMC service center. After two days, a service rep called and said they have to replace the engine. He said the 'bearings seized up'. I am wondering if this problem is a prevalent issue for the L87 engines. The service rep said he has had several engines with this problem and their dealership/service center is located in a small East Texas town. Has anyone else had this problem? The truck only has 4,400 miles on it."[21]

- 2023 Cadillac Escalade: "I have a 2023 Cadillac Escalade with less than 10,000 miles. The vehicle has been properly serviced and maintained. While the vehicle was in motion on the highway, the engine seized. A large boom sound followed by rattling, shaking and loss of power. An extremely scary situation. Based on my research I have discovered I am not the only person this has happened to. I have asked GM to buy back the vehicle but they have gone cold and have not acknowledged the incident. In addition I received an email from Onstar with a great diagnostic report. No check engine light or

---

[21] *See*
https://www.reddit.com/r/gmcsierra/comments/1fm1ypy/l87_62l_engine_bearing_failure/

any indication of unsafe operation. I have reached out to a major law firm who specializes in this kind of litigation as lead plaintiff. If you find yourself in the same boat on any 6.2 Liter engine in the last 2-3 years DM me and I can get you connected to an attorney."[22]

- 2023 Cadillac Escalade: "I am posting to ask advice. I purchased a 2023 Cadillac Escalade 4WD Sport Platinum with onyx package back in May 2023 for 130k. Fast forward 3 months and we have had a major issue. The car completely died out of the blue last week and was towed to the local dealership where it was purchased from. They have determined it was an engine failure and will be planning to do a complete new engine replacement. The car has maybe 4k miles on it and was bought brand new (at a 5k markup might I add). And otherwise running perfectly fine and being taken car [sic] of well. I am shocked as to being told it needs a new engine. The service advisor is telling me it could be in average 1 mo all the way up to 6 mo to get the new engine due to supply chain issues. So the question is am I entitled to any form of compensation while they are fixing my car? Does having a new engine replacement at not even 5k mi

---

[22] *See*
https://www.reddit.com/r/Chevy/comments/1d9ok6o/62_liter_engine_failure/

suggest major red flags on the car and should consider getting rid of it? We are really enjoyed [sic] the car as a family but now I am having second thoughts on this major purchase which is having major technical failures. Thankfully it is all covered under warranty so I am not paying anything out of pocket. Only the inconvenience of dealing with this all. Btw, they gave me a loaner Escalade for the past week but now are asking for it back because they apparently sold the vehicle today and asking me if it is okay to drive a Chevy Subrlyrban [sic] in the meantime. I'm a little ticked off by this. In my mind, I think they should waive my car payment while I wait for my car to be fixed bc I would be making pmts on a car I am not driving. Any thoughts / suggestions would be appreciated. Ty in advance."[23]

### D.    Defendant's Knowledge of the Defect

42.    GM was aware, or should have been aware, of the engine defect affecting the L87 Engine in the Class Vehicles well before the official Safety Recall No. 25V-274 ("Recall Notice") in April 2025, and certainly in December 2021 when it issued Technical Service Bulletin 19-NA-218. The Recall Notice

---

[23] *See* https://forum.leasehackr.com/t/new-2023-cadillac-escalade-engine-failure/489524

acknowledges that GM closed an initial investigation into the issue in February 2022. Knowledge of the Engine Defect was acquired through multiple channels, including pre-sale durability testing, analysis of warranty claims and dealership repair records, monitoring of customer complaints submitted to the NHTSA, direct customer reporting (including a dozen accident reports), issuance of technical service bulletins, and implementation of customer satisfaction programs.

43.    As a leading automotive manufacturer, GM conducts extensive pre-sale durability testing on its vehicles and components to ensure they meet performance and safety standards. The L87 Engine, introduced in 2019, underwent such testing. Despite these measures, the engine exhibited defects related to the crankshaft and connecting rods, which should have been identified during the validation process.

44.    GM's April 2025 Recall Notice indicates that GM had previously closed three prior investigations into the engine failure issue in February 2022, June 2023, and July 2024. The Reall Notice also states that between April 29, 2021 and February 3, 2025, GM received 28,102 field complaints or incidents related to failures of the L87 Engine due to crankshaft, connecting rod, or engine bearing issues. Of these, 14,332 involved allegations of loss of propulsion. GM's Recall Notice also states that GM identified 12 crashes and related injuries potentially

attributable to the Engine Defect, as well as 42 potentially related engine fires.[24]

45.    Prior to the Recall Notice, GM updated previously issued Technical Service Bulletin ("TSB") 19-NA-218 in December of 2021 to address "ticking noise from the engine" in various models equipped with the L87 Engine. While the TSB attributed the noise to lifter issues, the TSB indicates that GM was aware of serious valvetrain problems with the L87 Engine by late 2021, issues which show that GM knew about the Engine Defect in 2021.[25]

46.    Further, in February 2023, GM released Technical Service Bulletin PIP5900, addressing diagnostic tips for seized engines or engine noise in vehicles equipped with the L87 Engine. The bulletin highlighted potential crankshaft bearing failures as a cause of engine seizure, demonstrating GM's recognition of the Engine Defect's severity.[26]

47.    In June 2024, GM issued a follow up bulletin, Bulletin No. PIP5984, which placed the L87 Engine assembly on restriction due to internal engine concerns.[27] The bulletin instructed technicians to gather detailed information on bearing failures and metallic debris in the oil before moving forward with repairs, showing GM's awareness of ongoing issues with, and degradation of, the L87

---

[24] *See* https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF
[25] *See* https://static.nhtsa.gov/odi/tsbs/2021/MC-10212558-9999.pdf
[26] *See* https://static.nhtsa.gov/odi/tsbs/2023/MC-10232809-9999.pdf
[27] *See* https://dot.report/bulletins/11006405

Engine's internal components.

48.    GM is also legally obligated to monitor and analyze consumer complaints submitted to the NHTSA to identify potential safety defects. As early as January 2025, NHTSA's Office of Defects Investigation received 39 complaints and multiple field reports alleging engine failures in GM vehicles equipped with the L87 Engine.[28] These reports described sudden engine seizures and loss of propulsion without warning, underscoring the defect's safety risks.

49.    Despite accumulating evidence of the engine defect, GM delayed initiating a formal recall. It was only after the NHTSA opened Preliminary Evaluation PE25-001 in January 2025 that GM announced that it had commenced a comprehensive internal investigation, culminating in the issuance of Safety Recall No. 25V-274 on April 24, 2025.[29]

50.    The Recall Notice identifies two primary root causes for the engine failures: (1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out-of-specification crankshaft dimensions and surface finish. GM acknowledged that these defects can lead to engine damage and failure without warning, posing significant safety risks.[30]

---

[28] *See* https://static.nhtsa.gov/odi/inv/2025/INOA-PE25001-10002.pdf
[29] *See* https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF
[30] Id.

51.    GM's initial remedial measures for customers without engine failure—oil changes and component inspections—fail to address the issues underlying the Engine Defect. Only after substantial public scrutiny and regulatory pressure did GM implement a stop sale of the Class Vehicles.[31]

52.    The extensive timeline of complaints, technical bulletins, and internal investigations demonstrates that GM was aware, or should have been aware, of the Engine Defect well before the official recall. GM's failure to promptly disclose and rectify the defect resulted in prolonged exposure of consumers to potential engine failures and associated safety hazards.

### E.    GM's Recall Efforts

53.    GM's initial recall remedy for the defective L87 6.2L V8 engines, as outlined in Safety Recall No. 25V-274, primarily involves an inspection for diagnostic trouble code (DTC) P0016. If this code is present, the initial Recall Notice indicates that the engine may be repaired or replaced. If the code is absent, the remedy consists of changing the engine oil to a higher-viscosity grade (0W-40), replacing the oil filter and oil fill cap, and inserting an updated owner's manual page.[32]

---

[31] *See* https://www.thedrive.com/news/gm-issues-stop-sale-ahead-of-recall-for-blown-6-2l-v8s-in-some-2021-2024-trucks-and-suvs
[32] *See Id.*

54.    However, this approach has been criticized for not addressing the root cause of the engine failures, which GM identified as manufacturing defects in the connecting rods and crankshafts, including rod-bearing damage from sediment and out-of-specification crankshaft dimensions and surface finishes. The oil change remedy has been called a "band-aid" measure that does not rectify these underlying mechanical issues, leading to concerns that it merely delays inevitable engine failures.[33] It also imposes a long-term penalty on consumers in the form of increased fuel consumption, degraded engine efficiency, and higher operating costs—burdens not present when the vehicles were purchased or leased.

55.    The change to higher-viscosity oil materially alters the performance and fuel economy of the Class Vehicles. Thicker oil creates greater internal resistance and reduces the efficiency of systems like Dynamic Fuel Management, which depend on light-load conditions and low friction to optimize cylinder deactivation. GM is requiring consumers to use oil that is two grades thicker than the oil the engine was designed for—viscosity for 0W-40 oil is 50% greater than 0W-20. Industry studies acknowledge that this change may decrease fuel economy

---

[33] *See* https://www.torquenews.com/18003/i-was-told-gm-might-replace-every-l87-62l-engine-chevy-silverado-and-gmc-sierra-im-wondering; https://www.ainvest.com/news/gm-600-000-vehicle-recall-deep-dive-investment-implications-2504/

by at least 3–4%, and in some cases more, leading to hundreds of dollars in added fuel costs over the vehicle's life.[34]

56.    Even assuming that the oil remedy marginally reduces the likelihood of immediate engine failure, it effectively transfers risk and cost from GM to consumers. Owners must now track maintenance more closely, use a more expensive and less efficient oil formulation, and accept reduced vehicle performance—all without any acknowledgment of these consequences in GM's public communications. GM has not offered reimbursement for increased fuel costs or diminished value, despite the material impact on the total cost of ownership.

57.    Reports from vehicle owners and dealership communications suggest that GM may be reconsidering its initial remedy. Some dealerships have informed customers that the oil change solution is being abandoned in favor of full engine replacements for all affected vehicles. One owner reported being told by a dealership that GM might be abandoning the oil change remedy for the L87 6.2L engine recall and instead preparing to replace engines outright for every affected Silverado and Sierra.[35]

---

[34] *See* https://www.lube-media.com/wp-content/uploads/Lube-Tech-133-Fuel-economy-for-engine-oils-the-formulators-dilemma.pdf
[35] *See* https://www.torquenews.com/18003/i-was-told-gm-might-replace-every-l87-62l-engine-chevy-silverado-and-gmc-sierra-im-wondering?

58.    This reporting is consistent with Safety Recall N252494002 L87 Engine Loss of Propulsion, issued by GM to dealers in May 2025, which appears to abandon the high viscosity remedy in favor of replacing every L87 Engine.[36]

59.    Despite this potential shift in strategy, GM has not officially communicated a comprehensive plan for engine replacements, leading to confusion among consumers. Many owners report inconsistent information from dealerships, with some being told to wait for official instructions, while others are advised to bring their vehicles in for inspection.[37] This lack of clear guidance exacerbates consumer frustration and uncertainty.

60.    Compounding the issue is the reported shortage of replacement engines. Dealerships have indicated that even if engine replacements are authorized, the availability of new engines is limited, leading to extended wait times for repairs.[38] The inability of GM to meet the demand for replacement engines likely contributed to GM's decision to quietly issue a stop-sale on the Class Vehicles.

_____

[36] *See* https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-5347.pdf
[37] *Id.*
[38] *See* https://www.thedrive.com/news/gms-broken-6-2l-v8s-are-stranding-owners-for-weeks-as-replacement-engine-pipeline-dries-up#:~:text=But%20whether%20the%20engine%20in,demand%20in%20new%20trucks%20and

61.    In GM's Safety Recall N252494002, GM instructs its dealers that the "US National Traffic and Motor Vehicle Safety Act provides that each vehicle that is subject to a recall of this type must be adequately repaired within a reasonable time after the customer has tendered it for repair." And that a "failure to repair within sixty days after tender of a vehicle is prima facie evidence of failure to repair within a reasonable time."[39]

62.    If the condition is not adequately repaired within a reasonable time, GM tells its dealers that the "customer may be entitled to an identical or reasonably equivalent vehicle at no charge or to a refund of the purchase price less a reasonable allowance for depreciation."[40]

63.    But consumers are potentially facing substantially longer wait times than sixty days for the engine replacement. The logistical challenges of replacing engines in nearly 600,000 vehicles are significant. If GM proceeds with full engine replacements, it will likely require a substantial increase in production and distribution capacity, which may not be feasible in the short term. This situation leaves consumers in a precarious position, potentially driving vehicles with known defects while awaiting repairs.

---

[39] *See* https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-5347.pdf
[40] *Id.*

64.    Furthermore, there are concerns about the quality of replacement engines. Some owners who have received new engines report experiencing similar issues, suggesting that the replacements may also be affected by the same manufacturing defects.[41] This raises questions about the efficacy of the recall remedy and whether it truly resolves the underlying problems.

65.    In summary, GM's recall remedy for the L87 6.2L V8 engine defect appears insufficient and inadequately addresses the root causes of engine failures. The proposed solutions may not prevent future incidents, will negatively impact fuel economy, increasing fuel costs, and the logistical challenges of implementing widespread engine replacements further complicate the situation. Affected consumers face prolonged uncertainty, potential safety risks, increased costs, and diminished vehicle value as a result of these ongoing issues.

### F.    Fraudulent Omission/Concealment Allegations

66.    At this time, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals employed by GM responsible for making false and misleading statements regarding the Class Vehicles and failing to disclose information GM knew regarding the Engine Defect to Plaintiffs and other members of the putative class. Defendant is in possession of

---

[41] *See* https://gmauthority.com/blog/2025/04/gm-6-2l-v8-l87-engine-lawsuit-filed-in-illinois/

all of this information.

67.    Plaintiffs' claims arise out of Defendant's fraudulent omission/active concealment of the Engine Defect from Plaintiffs and other members of the putative class, despite Defendant's representations about performance, safety, and reliability.

68.    Plaintiffs, at all relevant times, including at the time Plaintiffs and Class members purchased their Class Vehicles, allege that Defendant knew, or was at least reckless in not knowing, of the Engine Defect; Defendant had a duty to disclose the Engine Defect based upon its exclusive knowledge, the significant safety risks the Engine Defect created, and the fact that the Engine Defect related to an intrinsic and important quality of these vehicles that neither Plaintiffs nor other members of the putative class could have discovered through the exercise of ordinary prudence and caution; and Defendant never disclosed the Engine Defect to Plaintiffs and Class members at any time or place in any manner prior to any of the recalls, as alleged herein.

69.    Defendant also actively concealed the Engine Defect by misrepresenting either directly or through its agents working at authorized GM dealerships to Plaintiffs and members of the putative Class who presented their vehicles for repair the nature, cause, and scope of the issues they had encountered with the engines in their Class Vehicles.

70.    Plaintiffs and members of the proposed Class reasonably relied upon Defendant's knowing, affirmative, and/or active concealment of the Engine Defect when they decided to purchase or lease Class Vehicles.

71.    Plaintiffs make the following, additional specific concealment/omission-based allegations with as much specificity as possible through reasonable investigation and absent discovery into information available exclusively only to Defendant:

**Who**: Defendant actively concealed and failed to disclose the Engine Defect to Plaintiffs and Class members by omitting it from all advertising and marketing materials, its website, and brochures, while at the same time promoting the reliability, durability, performance, and efficiency of the Class Vehicles, as alleged herein. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals responsible for such decision-making.

**What**: Defendant concealed, omitted, and failed to disclose that the Class Vehicles contain the Engine Defect, the attendant safety risks, and the engine failures, as alleged herein. Defendant concealed and omitted the Engine Defect while making representations about the safety, reliability, durability, fuel economy, and other attributes of the Class Vehicles, as alleged herein, at the time of purchase and during subsequent repair attempts.

**When**: Defendant concealed, omitted, and failed to disclose material

information regarding the Engine Defect at all times while making representations about the safety, reliability, fuel economy, and durability of the Class Vehicles on an ongoing basis, from at least 2021. And when consumers brought their vehicles to GM dealerships or called Defendant's respective customer service and warranty departments complaining of the Engine Defect or inquiring about the Engine Defect, Defendant's authorized dealerships provided inadequate remedies and provided incomplete information. At least in these interactions with Plaintiffs and members of the Class, Defendant's authorized GM dealerships and the personnel who worked at those dealerships acted as GM's agents in that they failed to disclose information regarding the Engine Defect at GM's direction or based upon GM's control of the information it provided to them and permitted them to disclose regarding the engine of Class Vehicles.

**Where:** Defendant concealed and omitted material information regarding the true nature of the Engine Defect in every form of communication they had with Plaintiffs and Class members, and made representations about the safety, reliability, durability, fuel economy, and performance of the Class Vehicles prior to issuing the current recall. Plaintiffs are aware of no document, communication, or other place or thing, in which Defendant disclosed the truth about the full scope of the Engine Defect in the Class Vehicles prior to the recalls. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's

manuals, or on Defendant's websites. There are many sources through which Defendant could have disclosed the Engine Defect, including, but not limited to, (1) point of sale communications; (2) the owner's manual; and/or (3) direct communications to Class members through means such as state vehicle registry lists and e-mail notifications. Defendant made no such disclosures.

**How:** Defendant concealed and omitted the Engine Defect from Plaintiffs and Class members and made misrepresentations about the safety, reliability, durability, and performance of the Class Vehicles, including as described herein. Defendant actively concealed and omitted the truth about the existence, scope, and nature of the Engine Defect from Plaintiffs and Class members at all times, even though Defendant knew about the Engine Defect and knew that information about the Engine Defect would be important to a reasonable consumer, and Defendant promised in its marketing materials that Class Vehicles have qualities that they do not have.

**Why:** Defendant actively concealed and omitted material information about the Engine Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class members to buy and/or lease Class Vehicles, rather than buying or leasing competitors' vehicles, and made representations about the safety, reliability, durability, fuel economy, and performance of the Class Vehicles. Had Defendant disclosed the truth, for example, in their advertisements or other materials or

53

communications, Plaintiffs and Class members (indeed, all reasonable consumers) would have been aware of it and would not have bought or leased the Class Vehicles or would not have paid as much for them.

### G.    Plaintiffs' Experience

<u>Plaintiff Muhammad</u>

72.    Plaintiff Muhammad bought a certified pre-owned 2023 GMC Yukon Denali for approximately $84,000 on January 29, 2025 from Deacon Jones Chevrolet GMC of Kinston, an authorized GM dealership in North Carolina.

73.    Before buying the 2023 GMC Yukon Denali, Plaintiff researched and reviewed the representations and promotional materials about the 2023 Yukon on the GM website regarding the 2023 Yukon's advertised features. GM never disclosed the Engine Defect to Plaintiff Muhammad in any of its representations or promotional materials. Moreover, the salesperson and the dealership never disclosed the Engine Defect to him or that the Engine Defect would materially affect his vehicle's capabilities or advertised features, either because GM withheld the Engine Defect from the dealership or did not authorize it to disclose the Engine Defect. Defendant's authorized GM dealerships and the personnel who worked at those dealerships, including those who interacted with Plaintiff Muhammad, acted as GM's agents and failed to disclose material information regarding the Engine Defect at GM's direction or based upon GM's control of the information it provided

to them and permitted them to disclose regarding the engines of Class Vehicles.

74.    If Plaintiff Muhammad had known about the Engine Defect before buying the 2023 Yukon, Plaintiff Muhammad would not have bought it or would have paid less for it.

75.    Plaintiff Muhammad's vehicle is subject to the L87 Engine Loss of Propulsion recall.

76.    Plaintiff Muhammad's 2023 Yukon could, at any time, lose propulsion, increasing the risk of a crash, due to the Engine Defect. Plaintiff Muhammad's 2023 Yukon's value is diminished as a result.

<u>Plaintiff Miskella</u>

77.    Plaintiff Miskella bought a new 2024 Chevrolet Silverado for over $70,000 on March 1, 2024 from Dublin Chevrolet Cadillac, an authorized GM dealership in California.

78.    Before buying the 2024 Chevrolet Silverado, Plaintiff researched and reviewed the representations and promotional materials about the 2024 Silverado on the Internet, including the GM website, regarding the 2024 Silverado's advertised features. GM never disclosed the Engine Defect to Plaintiff Miskella in any of its representations or promotional materials. Moreover, the salesperson and the dealership never disclosed the Engine Defect to him or that the Engine Defect would materially affect his vehicle's capabilities or advertised features, either

because GM withheld the Engine Defect from the dealership or did not authorize it to disclose the Engine Defect. Defendant's authorized GM dealerships and the personnel who worked at those dealerships, including those who interacted with Plaintiff Miskella, acted as GM's agents and failed to disclose material information regarding the Engine Defect at GM's direction or based upon GM's control of the information it provided to them and permitted them to disclose regarding the engines of Class Vehicles.

79.    If Plaintiff Miskella had known about the Engine Defect before buying the 2024 Silverado, Plaintiff Miskella would not have bought it or would have paid less for it.

80.    Plaintiff Miskella's vehicle is subject to the L87 Engine Loss of Propulsion recall.

81.    Plaintiff Miskella's 2024 Silverado could, at any time, lose propulsion, increasing the risk of a crash, due to the Engine Defect. Plaintiff Miskella's 2024 Silverado's value is diminished as a result.

**H.  Tolling of the Statutes of Limitations**

82.    **<u>Discovery Rule.</u>** Plaintiffs' and Class members' claims accrued upon discovery of the Engine Defect in their Class Vehicles that created the risk of sudden and catastrophic engine failure. While Defendant knew, and concealed, the facts that the Class Vehicles have the Engine Defect that creates a significant risk

of sudden and catastrophic engine failure, Plaintiffs and Class members could not and did not discover these facts sooner through reasonable diligent investigation.

83. **Active Concealment Tolling**. Any statutes of limitations are tolled by Defendant's knowing and active concealment of the Engine Defect in the Class Vehicles, as described above. Defendant kept Plaintiffs and all Class members ignorant of vital information essential to the pursuit of their claim, without any fault or lack of diligence on the part of Plaintiffs. The details of Defendant's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. Plaintiffs could not reasonably have discovered the Engine Defect in their Class Vehicles. Because Defendant actively concealed, and continued to actively conceal, the Engine Defect in the Class Vehicles, it is estopped from relying on any statute of limitations defense and/or all statutes of limitations for the claims of Plaintiffs and the putative Class members have been tolled.

84. **Estoppel**. Defendant was and is under a continuous duty to disclose to Plaintiffs and all Class members the true character, quality, and nature of the Engine Defect in the Class Vehicles. At all relevant times, and continuing to this day, Defendant knowingly, affirmatively, and actively concealed the true character, quality, and nature of the Engine Defect in the Class Vehicles. The details of Defendant's efforts to conceal the above-described unlawful conduct are in their

possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. Plaintiffs reasonably relied upon Defendant's active concealment. Based on the foregoing, Defendant is estopped from relying upon any statutes of limitation in defense of this action.

85.    **Equitable Tolling**. Defendant took active steps to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and leased Class Vehicles with the Engine Defect. The details of Defendant's efforts to conceal the above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## CLASS ACTION ALLEGATIONS

86.    Pursuant to Rule 23(a), (b)(2), and/or (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves, and a Class defined as follows: All persons in the United States who own, owned, lease, and/or leased a Class Vehicle ("Nationwide Class").

87.    Pursuant to Rule 23(a), (b)(2), and/or (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, Plaintiff Muhammad brings this action on behalf

of himself, and a Subclass defined as follows: All persons in Pennsylvania who own, owned, lease, and/or leased a Class Vehicle ( "Pennsylvania Subclass").

88.      Pursuant to Rule 23(a), (b)(2), and/or (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, Plaintiff Miskella brings this action on behalf of himself, and a Subclass defined as follows: All persons in California who own, owned, lease, and/or leased a Class Vehicle ( "California Subclass").

89.      Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant; any entities in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse; members of the judge's staff or the judge's family; any individuals who have personal injury claims resulting from the Engine Defect and alleged misconduct; and anyone who purchased a Class Vehicle for the purpose of resale.

90.      Plaintiffs reserve the right to revise the class definitions after having an opportunity to conduct discovery and further investigation.

91.      Members of the proposed Classes are readily ascertainable because the class definition is based upon objective criteria.

92.      **Numerosity**. Defendant has sold many thousands of Class Vehicles throughout the United States. Members of the proposed Classes likely number in

the thousands and are thus too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

93.    **Commonality and Predominance**. Common questions of law and fact exist as to all members of the proposed Classes and predominate over questions affecting only individual class members. These common questions include, but are not limited to:

a.    Whether GM sold the Class Vehicles with the Engine Defect;

b.    Whether GM knew about the Engine Defect in the Class Vehicles when placing them in the U.S. stream of commerce;

c.    When GM became aware of the Engine Defect in the Class Vehicles;

d.    Whether GM had a duty to disclose the Engine Defect in the Class Vehicles;

e.    Whether Plaintiffs and Class members overpaid for the Class Vehicles due to the Engine Defect;

f.    Whether GM is liable to Plaintiffs and Class members for fraudulent concealment and omissions;

g.    Whether GM is liable to Plaintiffs and Class members for negligent misrepresentation and omissions; and

h.    Whether GM is liable to Plaintiffs and Class members for breach of the

implied warranty of merchantability.

94.    **Typicality**. Plaintiffs' claims are typical of the claims of the proposed Classes. Plaintiffs and the members of the proposed Classes all purchased or leased the Class Vehicles with the Engine Defect that are at risk for sudden and catastrophic engine failure, giving rise to substantially the same claims. As illustrated by consumer complaints, some of which have been excerpted above, each Class Vehicle included in the proposed class definition suffers from the Engine Defect that Plaintiffs complains about.

95.    **Adequacy**. Plaintiffs are adequate representatives of the proposed Classes because their interests do not conflict with the interests of the members of the Classes they seek to represent. Plaintiffs have retained counsel who are competent and experienced in complex class action litigation and will prosecute this action vigorously on Class members' behalf.

96.    **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendant economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the Engine Defect, individualized litigation

presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court

97.    In the alternative, the proposed Classes may be certified because:

a.   the prosecution of separate actions by the individual members of the proposed class(es) would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendant;

b.   the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

c.   Defendant has acted or refused to act on grounds generally applicable to the proposed Classes, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

## CAUSES OF ACTION

## COUNT I – FRAUDULENT CONCEALMENT AND OMISSION
### (Common Law)
### (Plaintiffs on behalf of the proposed Nationwide Class)

98.    Plaintiffs hereby reallege and incorporate by reference, as though

fully set forth herein, the allegations contained in Paragraphs 1 through 97.

99.    Plaintiffs bring this Count on behalf of the Nationwide Class.

100.    Plaintiffs' claim for fraudulent concealment and omission arises from Defendant's affirmative representations about the safety, reliability, durability, performance, fuel economy, and quality of the Class Vehicles, and simultaneous concealment and omission of the Engine Defect, as more specifically outlined below and described more fully throughout this Complaint.

101.    **What and When.** In its advertisements and other marketing materials about the Class Vehicles, public statements about the Class Vehicles, representations about the Class Vehicles during the purchase or leasing process, and representations at the point of sale (including warranties), Defendant made representations about the safety, reliability, durability, performance, fuel economy, quality, and other attributes of the Class Vehicles and the engine in those vehicles to Plaintiffs and the Class members.

102.    In these advertisements and other marketing materials about the Class Vehicles, public statements about the Class Vehicles, representations about the Class Vehicles during the purchase or leasing process, representations at the point of sale (including warranties), and in all other communications made to the public, Plaintiffs, and putative Class Members regarding the Class vehicles, Defendant

actively concealed and omitted mention of material information about the Engine Defect to Plaintiffs and the Class members.

103.   Defendant was aware of the Engine Defect, the safety risks posed by the Engine Defect, actual catastrophic engine failures that had already occurred as a result of the Engine Defect, and the affect the Engine Defect would have on the value, safety, advertised features, and functionality of the Class Vehicles, yet it actively concealed and failed to disclose that information to Plaintiffs and members of the putative Class.

104.   Defendant had a duty to disclose to Plaintiffs and members of the putative Class information about the Engine Defect, which posed a serious safety risk to them and their property, which affected the value, safety, advertised features, and functionality of the Class Vehicles, which Defendant had superior knowledge regarding, and which related to intrinsic qualities of the Class Vehicles (namely, the 6.2-Liter V8 L87 engine) and which could not have been discovered by the exercise of ordinary prudence and caution.

105.   Defendant's omission of, failure to disclose, and active concealment of material information about the Engine Defect was uniform with respect to Plaintiffs and the members of the putative Class, and the information Defendant withheld went to the central aspect of the Class Vehicles.

106. Defendant concealed and omitted this material information regarding the Engine Defect at all times and on an ongoing basis—from at least 2021 and continuing to the present. To this day, Defendant still has not fully disclosed the truth about or the full scope of the Engine Defect in the Class Vehicles. And when consumers brought their vehicles to GM dealerships (which information was conveyed to GM) or called Defendant's customer service and warranty departments complaining or inquiring about the Engine Defect, Defendant and its authorized dealerships denied any knowledge about the Engine Defect or of any adequate repair that would correct the Engine Defect.

107. **Who.** Upon information and belief, these knowing misrepresentations and omissions and active concealment occurred as a result of actions by decisionmakers at GM whose identities are currently not known to Plaintiffs and members of the Class and whose identities could not be discovered by Plaintiffs. These decisionmakers also caused all spokespersons authorized to speak on behalf of Defendant (including its customer service and salespersons at Defendant's authorized dealerships and all others who participated in and facilitated the sale of any Class Vehicles to Plaintiffs and Class members) to make the misrepresentations and omissions identified above about the Class Vehicles to Plaintiffs and members of the proposed Class.

108. **Where:** Defendant concealed and omitted material information regarding the true nature of the Engine Defect in every form of communication it had with (or directed to) Plaintiffs and Class members regarding the performance, safety, reliability, fuel economy, quality, and other attributes of the Class Vehicles. Information regarding the Engine Defect is not disclosed in any sales documents, displays, advertisements, other public communications, warranties, owner's manuals, or on Defendant's websites. There are many avenues through which Defendant could have disclosed the Engine Defect, including, but not limited to, (1) point-of-sale communications and disclosure documents; (2) the owner's manual for Class Vehicles; and/or (3) direct communications to Class members through means such as state vehicle registry lists and e-mail notifications. Defendant did not make any disclosure regarding the Engine Defect.

109. **How:** Defendant concealed and omitted mention of the Engine Defect from Plaintiffs and Class members and made representations about the safety, reliability, durability, performance, quality, and other attributes of the Class Vehicles. Defendant actively concealed and omitted the truth about the existence, scope, and nature of the Engine Defect from Plaintiffs and Class members at all times, even though Defendant knew about the Engine Defect. Defendant also knew that information about the Engine Defect would be important to any reasonable consumer and that Plaintiffs and Class Members would reasonably rely upon its

promises in its marketing materials, sales materials, and other statements that Class

Vehicles have qualities and attributes that they do not have in which Defendant

omitted, concealed, and failed to disclose the Engine Defect. Had Defendant

disclosed the Engine Defect, Plaintiffs and Class members would have reviewed

or learned about the Engine Defect, and they would not have purchased or leased

the Class Vehicles, or they would have paid less, and would not have paid a

premium.

110.   **Why:** Defendant actively concealed and omitted material information

about the Engine Defect with the intent to deceive Plaintiffs and the Class members

and with the intent to induce Plaintiffs and Class members to buy and/or lease

Class Vehicles, rather than buying or leasing competitors' vehicles or purchasing

Class Vehicles for a lower price. Had Defendant disclosed the truth, for example,

in their advertisements or other materials or communications, Plaintiffs and Class

members (all reasonable consumers) would have been aware of it and would not

have bought or leased the Class Vehicles or would not have paid as much for them.

111.   Defendant actively concealed and suppressed these materials facts

about the Engine Defect, in whole or in part, in order to maintain a market for the

vehicles, to protect its profits, and to avoid costly recalls that could expose

Defendant to liability and harm Defendant's commercial reputation. Defendant did

so at the expense of and by creating serious safety risks to Plaintiffs the class members.

112.  Plaintiffs and Class members did, in fact, rely on Defendant's omissions and concealment by purchasing or leasing Class Vehicles at the prices they paid, believing that their vehicles did not have an Engine Defect that would impair the performance, safety, reliability, quality, and value of the Class Vehicles.

113.  Plaintiffs and Class members reasonably and justifiably relied on Defendant's misrepresentations and omissions in deciding to purchase or lease Class Vehicles. Defendant and its agents were the sole parties to the sales transaction that possessed knowledge about the existence and risk of the Engine Defect in its own vehicles. Any consumer, in making the decision of whether to purchase any Class Vehicle, had no choice but to rely on what Defendant communicated to them and to the public about the vehicle's performance, safety, reliability, and quality.

114.  Plaintiffs and the Class members could not have discovered the truth behind Defendant's misrepresentations and omissions through the exercise of reasonable diligence because a defect *inside* an engine is not visible to the consumer and is not detectible by a consumer. Detection of such a defect would require specialized knowledge and skill the average consumer does not have, as well as specialized and costly equipment to which Plaintiffs and the Class do not

have access. Plaintiffs and Class members thus had no way of learning the facts that Defendant concealed or failed to disclose about the Engine Defect in the Class Vehicles.

115.  Moreover, no reasonable consumer would have expected vehicles permissibly sold in the United States would contain a serious safety defect known to the entity that markets those vehicles that poses such a significant risk of harm to person and property.

116.  Defendant's misrepresentations and omissions proximately caused damages to Plaintiffs and Class members.

117.  Defendant's misrepresentations and omissions proximately caused Plaintiffs and class members to suffer loss in at least the following ways: out of pocket losses, including but not limited to, overpayment for the Class Vehicles at the point of sale; increased costs; reduction in the value the Class Vehicle; complete loss of their ability to use the Class Vehicle; loss of the ability to use the Class Vehicle in the way, or to the extent, advertised and promised by Defendant, including but not limited to being subject to the sudden and catastrophic risk of engine failure and loss of power, while driving.

## COUNT II – NEGLIGENT MISREPRESENTATION/OMISSION
### (Common Law)
### (Plaintiffs on behalf of the proposed Nationwide Class)

118.  Plaintiffs hereby reallege and incorporate by reference, as though

fully set forth herein, the allegation contained in Paragraphs 1 through 97.

119.   Plaintiffs bring this Count on behalf of the Nationwide Class.

120.   Plaintiffs' claim for negligent misrepresentation arises from Defendant's affirmative representations about the safety, reliability, durability, performance, and quality of the Class Vehicles, and simultaneous negligent or reckless omission of and failure to disclose information regarding the Engine Defect to Plaintiffs and Class Members, as more specifically outlined below and described more fully throughout this Complaint.

121.   **What and When.** In its advertisements and other marketing materials about the Class Vehicles, public statements about the Class Vehicles, representations about the Class Vehicles during the purchase or leasing process, and representations at the point of sale (including warranties), Defendant made representations about the safety, reliability, durability, performance, fuel efficiency, quality, and other attributes of the Class Vehicles to Plaintiffs and the Class members.

122.   In these advertisements and other marketing materials about the Class Vehicles, public statements about the Class Vehicles, representations about the Class Vehicles during the purchase or leasing process, and representations at the point of sale (including warranties), Defendant, at the very least, negligently and recklessly omitted and/or failed to disclose material information about the Engine

Defect to Plaintiffs and the Class members.

123.   Defendant was aware of the Engine Defect, the safety risks posed by the Engine Defect, actual sudden and catastrophic engine failure that had already occurred as a result of the Engine Defect, and the affect the Engine Defect would have on the value and safety of Class Vehicles, and yet failed to disclose that information to Plaintiffs and members of the putative Class.

124.   Defendant had a duty to disclose to Plaintiffs and members of the putative Class information about the Engine Defect, which posed a serious safety risk to them and their property, which Defendant had superior knowledge regarding, and which related to intrinsic qualities of the Class Vehicles (namely, the 6.2-Liter V8 L87 engine) and which could not have been discovered by the exercise of ordinary prudence and caution.

125.   Defendant's omission, failure to disclose, and active concealment of material information about the Engine Defect was uniform with respect to Plaintiffs and the members of the putative Class, and the information Defendant withheld went to the central aspect of the Class Vehicles.

126.   Defendant, at the very least, negligently and recklessly omitted material information regarding the Engine Defect at all times and on an ongoing basis—from at least 2021 and continuing to the present. To this day, Defendant still has not fully disclosed the truth about or the full scope of the Engine Defect

in the Class Vehicles. And when consumers brought their vehicles to GM dealerships or called Defendant's customer service and warranty departments complaining or inquiring about the Engine Defect, Defendant's authorized dealerships (acting as agents for Defendant and conveying information only as directed by Defendant) have negligently or recklessly denied any knowledge of the Engine Defect or of any adequate repair that would correct the Engine Defect.

127.    **Who.** These negligent or reckless misrepresentations and omissions were made by Defendant as a result of actions by decisionmakers at Defendant whose identities are currently not known to Plaintiffs and members of the Class and whose identities could not be discovered by Plaintiffs. These decisionmakers also caused all spokespersons authorized to speak on behalf of Defendant (including its customer service and salespersons at Defendant's authorized dealerships and all others who participated in and facilitated the sale of any Class Vehicles to Plaintiffs and Class members) to make the misrepresentations and omissions identified above about the Class Vehicles to Plaintiffs and members of the putative Class.

128.    **Where:** Defendant negligently or recklessly omitted material information regarding the true nature of the Engine Defect in all communications it had with (or directed to) Plaintiffs and Class members about the safety, reliability, durability, performance, quality, and other attributes of the Class

Vehicles. Information about the Engine Defect is not sufficiently disclosed in any sales documents, displays, advertisements, other public communications, warranties, owner's manuals, or on Defendant's websites. There are many avenues through which Defendant could have disclosed the Engine Defect, including, but not limited to, (1) point-of-sale communications and disclosure documents; (2) the owner's manual for Class Vehicles; and/or (3) direct communications to Class members through means such as state vehicle registry lists and e-mail notifications. Defendant did not avail itself of these means of communications.

129.   **How:** Defendant negligently or recklessly omitted from information about the Engine Defect from statements to Plaintiffs and Class members and made representations about the safety, reliability, durability, performance, quality, and other attributes of the Class Vehicles that, without disclosure of the Engine Defect, were actively misleading. Defendant omitted the truth about the existence, scope, and nature of the Engine Defect from Plaintiffs and Class members at all times, even though Defendant knew about the Engine Defect and knew, or reasonably should have known, that information about the Engine Defect would be important to any reasonable consumer. Defendant also knew that complete and accurate information about the 6.2-Liter V8 L87 engine, including the existence and scope of the Engine Defect, would be important to any reasonable consumer and that Plaintiffs and Class Members would reasonably rely upon its promises in its

73

marketing materials, sales materials, and other statements that Class Vehicles have qualities and attributes that they do not have in which Defendant omitted, concealed, and failed to disclose the Engine Defect.

130.    **Why:** Defendant negligently or recklessly failed to disclose material information about the Engine Defect to induce Plaintiffs and Class members to buy to buy and/or lease Class Vehicles, rather than buying or leasing competitors' vehicles or purchasing Class Vehicles for a lower price. Had Defendant disclosed the truth, for example, in their advertisements or other materials or communications, Plaintiffs and Class members (all reasonable consumers) would have been aware of it and would not have bought or leased the Class Vehicles or would not have paid as much for them.

131.    Defendant negligently or recklessly failed to disclose these material facts about the Engine Defect, in whole or in part, in order to maintain a market for the vehicles, to protect its profits, and to avoid costly recalls that could expose Defendant to liability and harm Defendant's commercial reputation. Defendant did so at the expense of and by creating serious risks to the safety of Plaintiffs and the Class members.

132.    Plaintiffs and Class members did, in fact, rely on Defendant's inadequate disclosures by purchasing or leasing Class Vehicles, at the prices they paid, believing that their vehicles would not have an Engine Defect that would

impair the safety, reliability, durability, performance, quality, and value of their Class Vehicles.

133.   Plaintiffs and Class members reasonably and justifiably relied on Defendant's negligent or reckless misrepresentations and omissions in deciding to purchase or lease Class Vehicles. Defendant and its agents were the sole parties to the sales transaction that possessed knowledge about the existence and risk of the Engine Defect in its own vehicles. Any consumer, in making the decision of whether to purchase any Class Vehicle had no choice but to rely on what Defendant communicated to them and to the public about the vehicle's performance, safety, reliability, and quality.

134.   Plaintiffs and the Class members could not have discovered the truth behind Defendant's misrepresentations and omissions though the exercise of reasonable diligence because a defect *inside* an engine is not visible to the consumer and is not detectible by a consumer. Detection of such a defect would require specialized knowledge and skill the average consumer does not have, as well as specialized and costly equipment to which Plaintiffs and the Class members do not have access. Plaintiffs and Class members thus had no way of learning the facts that Defendant concealed or failed to disclose about the Engine Defect in the Class Vehicles.

135.   Moreover, no reasonable consumer would have expected vehicles

permissibly sold in the United States would contain a serious safety defect known to the entity that markets those vehicles that poses such a significant risk of harm to person and property.

136.    Defendant's negligent or reckless misrepresentations and omissions proximately caused damages to Plaintiffs and Class members.

137.    Defendant's misrepresentations and omissions proximately caused Plaintiffs and class members to suffer loss in at least the following ways: complete loss of their ability to use the Class Vehicle; loss of the ability to use the Class Vehicle in the way, or to the extent, advertised and promised by Defendant; reduction in the value the Class Vehicle; increased costs; and being subject to the risk of sudden and catastrophic engine failure and loss of power, while driving.

## COUNT III – UNJUST ENRICHMENT
### (Common Law)
### (Plaintiffs on behalf of the proposed Nationwide Class)

138.    Plaintiffs hereby reallege and incorporate by reference, as though fully set forth herein, the allegation contained in Paragraphs 1 through 97.

139.    Plaintiffs bring this Count on behalf of the Nationwide Class.

140.    This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs.

141.    GM has received and retained a benefit from Plaintiffs and inequity has resulted.

142.    GM has benefitted from selling and leasing the Class Vehicles, for more than they were worth as a result of GM's actions, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

143.    Thus, all Plaintiffs conferred a benefit on GM.

144.    It is inequitable for GM to retain these benefits.

145.    Plaintiffs were not aware of the true facts about the Class Vehicles prior to purchase or lease, and did not benefit from GM's conduct.

146.    GM knowingly accepted the benefits of its unjust conduct.

147.    As a result of GM's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT IV - BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Uniform Commercial Code § 2-314)

148.    Plaintiffs hereby reallege and incorporate by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 97.

149.    Plaintiffs bring this claim on behalf of the Nationwide Class under Pennsylvania law or, in the alternative, the laws of separate states, against the Defendant.

150.    GM breached its implied warranty of merchantability by failing to provide merchantable goods. Plaintiffs and the Class Members have suffered damages as a result of GM's breach of this warranty.

151.   The Class Vehicles are "goods," Defendant GM is a "merchant," "seller," and "lessor" of the Class Vehicles, and Plaintiffs and Class Members who purchased and leased the Class Vehicles are "buyers" and "lessees."

152.   The Class Vehicles were not merchantable, and as such GM breached the implied warranty of merchantability, because at the time of sale and all times thereafter:

a.      The Class Vehicles would not pass without objection in the automotive trade because of the Engine Defect;

b.      The Engine Defect renders the Class Vehicles unsafe to drive and unfit for ordinary purposes;

c.      The Class Vehicles were inadequately labeled as safe and reliable, and the labeling failed to disclose the Engine Defect; and

d.      The Class Vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

153.   GM was on notice of the Engine Defect since at least 2021—and GM had an opportunity to cure the Engine Defect that it failed to cure. Moreover, GM was provided notice of the Engine Defect by numerous NHTSA complaints filed against them, internal investigations, and warranty claims before or within a reasonable amount of time after the Engine Defect became public. Thus, affording

GM a reasonable opportunity to cure the Engine Defect would be unnecessary and futile.

154.   In the alternative, notice and an opportunity to cure has been waived as a result of GM's active concealment of the Engine Defect, its superior knowledge of the Engine Defect, and its failure despite that knowledge to take adequate action to address the Engine Defect.

155.   Plaintiffs and Class members have had sufficient direct dealings with either GM or its agents to establish privity of contract.

156.   Plaintiffs and Class members are in privity with GM with respect to the Class Vehicles by reason of warranties GM agreed to with respect to the Class Vehicles.

157.   Privity was also established when GM made direct representations to Plaintiffs and Class members regarding the safety of Class Vehicles and extended an express warranty to Plaintiffs and Class members, who were end users of the Class Vehicles.

158.   Alternatively, privity is not required because Plaintiffs and Class members are intended third-party beneficiaries of contracts between GM and its agents and dealerships, and specifically, of the implied warranties.

159.   Alternatively, privity is not required because the Class Vehicles are dangerous instrumentalities due to the Engine Defect.

160. GM knew that the Class Vehicles were defective and posed safety risks, and that the Class Vehicles would continue to pose safety risks after the warranties purportedly expired. GM failed to disclose the defect to Plaintiffs and other Class members. Therefore, GM's enforcement of any durational limitations on warranties is inequitable and unlawful.

161. Any attempt by GM to limit or disclaim the implied warranty in a manner that would exclude coverage of the Engine Defect is unconscionable as a matter of law because the relevant purchase transactions were tainted by GM's concealment of material facts. GM knew at the time of sale that the Engine Defect existed and that the warranty may expire before a reasonable consumer would notice or observe the defect. Thus, any such effort by GM to disclaim, or otherwise limit, its liability for the Engine Defect would be inequitable, ineffective, and unlawful.

162. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including out-of-pocket costs associated with returning their Class Vehicles to a safe condition, the costs of needed present and future repairs, increased fuel costs, an inability to use the Class

Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

### COUNT V – VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (73 P.S. § 201-1 *ET SEQ.*)
### (Plaintiff Muhammad on behalf of the proposed Pennsylvania Subclass)

163.    Plaintiff Muhammad hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 97.

164.    Plaintiff Muhammad brings this Count on behalf of the Pennsylvania Class members.

165.    Plaintiff Muhammad purchased or leased his Class Vehicle primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

166.    All of the acts complained of herein were perpetrated by GM in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

167.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv)

"Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

168. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles have the Engine Defect, endangering the personal safety of drivers and passengers, causing damage to property, and thus requiring repair. Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be free of any defect impacting safety. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity,

tendency or effect of deceiving or misleading consumers; failed to state a material

fact that deceives or tends to deceive; and constitute deception, fraud, false pretense,

false promise, misrepresentation, or knowing concealment, suppression, or

omission of any material fact with the intent that a consumer rely on the same in

connection with the Class Vehicles. GM engaged in unfair and deceptive business

practices in violation of the Pennsylvania CPL.

169.   In purchasing or leasing the Class Vehicles, Plaintiff Muhammad and

Pennsylvania Class members were deceived by GM's failure to disclose the L87

Engine had a latent and dangerous mechanical flaw exposing owners to sudden

engine failure, increased oil consumption, compromised performance, and

increased operating costs.

170.   Plaintiff Muhammad and Pennsylvania Class members reasonably

relied upon GM's false misrepresentations and misleading statements and had no

way of knowing that GM's representations were false and gravely misleading. As

alleged herein, GM engaged in extremely sophisticated methods of deception.

Plaintiff Muhammad and Pennsylvania Class members did not, and could not,

unravel GM's deception on their own, as the defects inherent in the L87 Engine are

related to deeply internal component parts in the Class Vehicles and Plaintiff

Muhammad and other Pennsylvania Class members were not aware of the defective

nature of the L87 Engine prior to purchase or lease. GM's unfair or deceptive acts

or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

171. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Muhammad and the Pennsylvania Class.

172. GM knew or should have known that its conduct violated the Pennsylvania CPL.

173. GM owed Plaintiff Muhammad and the Pennsylvania Class a duty to disclose the truth about the Engine Defect because GM:

  a. Possessed exclusive knowledge of the design of the Class Vehicles including the Engine Defect;

  b. Intentionally concealed the foregoing from Plaintiff Muhammad and the Pennsylvania Class; and

  c. Made incomplete representations regarding the safety, quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff Muhammad and Pennsylvania Class members that contradicted these representations.

174. Due to GM's specific and superior knowledge of the Engine Defect, its false representations regarding the safety, reliability, durability, and fuel economy of the Class Vehicles, and Plaintiff Muhammad's and other Pennsylvania

Class members' reliance on these material representations, GM had a duty to disclose the Engine Defect to Plaintiff Muhammad and other Pennsylvania Class members.

175.   Having volunteered to provide information to Plaintiff Muhammad and Pennsylvania Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased by Plaintiff Muhammad and purchased or leased by Pennsylvania Class members. Longevity, durability, performance, and safety are material concerns to consumers.

176.   GM's conduct proximately caused injuries to Plaintiff Muhammad and to the other Pennsylvania Class members.

177.   GM's violations present a continuing risk to Plaintiff Muhammad as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

178.   Plaintiff Muhammad and the other Pennsylvania Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a direct and proximate result of GM's conduct, Plaintiff Muhammad and Pennsylvania Class members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including out-of-pocket costs associated with returning their

Class Vehicle to a safe condition, the costs of needed present and future repairs, increased fuel costs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

179.   GM is liable to Plaintiff Muhammad and Pennsylvania Class members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff Muhammad and the Pennsylvania Class members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT VI – BREACH OF IMPLIED WARRANTY
### (13 Pa. Cons. Stat. Ann. § 2314)
### (Plaintiff Muhammad on behalf of the proposed Pennsylvania Subclass)

180.   Plaintiff Muhammad hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 97.

181.   Plaintiff Muhammad brings this Count on behalf of the Pennsylvania Class.

182.    GM is a merchant with respect to motor vehicles within the meaning of the 13 Pa. Cons. Stat. Ann. § 2314.

183.   Under 13 Pa. Cons. Stat. Ann. § 2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions

when Plaintiff Muhammad and Pennsylvania Class members purchased or leased their Class Vehicles from GM.

184.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

185.   The Engine Defect in the Class Vehicles renders them unsafe, unreliable, and prone to catastrophic engine failure (oftentimes while the vehicle is in motion), thereby causing an increased likelihood of serious injury or death. This defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes.

186.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, outside investigations, NHTSA and forum complaints, and by numerous communications from Class members.

187.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiff Muhammad and Pennsylvania Class members have been damaged in an amount to be proven at trial.

**COUNT VII – VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**
**(Plaintiff Miskella on behalf of the proposed California Subclass)**

188.   Plaintiff Miskella hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 97.

189.   Plaintiff Miskella brings this claim on behalf of the California Class.

190.   Defendant has violated and continues to violate California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, and fraudulent business acts or practices.

191.   Defendant's acts and practices, as alleged in this complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law. In particular, Defendant sold the Class Vehicles to Class members despite the Engine Defect in those vehicles and failed to disclose the Engine Defect and its attendant risks at the point of sale, in advertising materials, or otherwise.

192.   Defendant's business acts and practices are unlawful in that they violate the Consumers Legal Remedies Act, Cal. Civil Code § 1750, *et seq*., and other laws as alleged herein.

193.   Defendant's acts and practices also constitute fraudulent practices in that they are likely to deceive a reasonable consumer. As described above, Defendant knowingly concealed and failed to disclose at the point of sale and otherwise that the Class Vehicles have the Engine Defect, endangering the personal safety of drivers and passengers, causing damage to property, and thus requiring repair. Had Defendant disclosed these material facts, Plaintiff Miskella would have learned about them given Plaintiff's prior research and/or discussions with the

dealerships before leasing and/or purchasing the Class Vehicles. Had Defendant disclosed these material facts, Plaintiff Miskella, California Class members, and reasonable consumers would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

194. Defendant's conduct also constitutes unfair business practices for at least the following reasons:

a. The gravity of harm to Plaintiff Miskella and the California Class members from Defendant's acts and practices far outweighs any legitimate utility of that conduct;

b. Defendant's conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff Miskella and the California Class members; and

c. Defendant's conduct undermines or violates the stated policies underlying the Consumers Legal Remedies Act—to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the marketplace.

195. As a direct and proximate result of Defendant's business practices, Plaintiff Miskella and California Class members suffered injury in fact and lost money or property, because they purchased and paid for vehicles that they otherwise would not have, or in the alternative, would have paid less for.

196.  Plaintiff Miskella and California Class members are entitled to equitable relief, including restitution to compensate Plaintiff Miskella and California Class members as a result of Defendant's unlawful, unfair and deceptive, and fraudulent practices, and an injunction enjoining Defendant's misconduct as alleged herein, directing Defendant to disclose the existence of the Engine Defect to all owners and lessees of the Class Vehicles, and directing Defendant to provide an adequate repair. Plaintiff Miskella, California Class members, and members of the public will suffer irreparable injury if an injunction is not ordered as they are at risk for bodily injury. Plaintiff Miskella will also suffer irreparable injury if Defendant's misleading practices are not enjoined. Plaintiff Miskella has an interest in buying GM's vehicles in the future, often sees marketing for GM's vehicles, and will consider purchasing GM's vehicles in the future, if possible, but has no way of determining whether GM's vehicles are defective.

197.  Plaintiff Miskella brings this Claim on behalf of California Class members in the alternative to any Claims brought for legal remedies and expressly allege that for purposes of this Claim they lack adequate remedies at law. Among other things, the restitution that may be available under this claim, including for restitutionary disgorgement of revenues attributable to an increased volume of vehicle sales made possible by the challenged practices, may not be recoverable as damages or otherwise at law. Given the market share held by Defendant, Plaintiff

Miskella, individually and as a member of the California Class, also has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Defendant's alleged misconduct is ongoing and therefore damages may not be certain or prompt and thus are an inadequate remedy to address the conduct that the requested injunctions are designed to prevent.

### COUNT VIII – VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
#### (Cal. Civ. Code § 1750, *et seq.*)
#### (Plaintiff Miskella on behalf of the proposed California Subclass)

198. Plaintiff Miskella hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 97.

199. Plaintiff Miskella brings this claim on behalf of the California Class.

200. Defendant is a "person" within the meaning of Civil Code §§ 1761(c) and 1770 and has provided "goods" within the meaning of Civil Code §§ 1761(a) and 1770.

201. Plaintiff Miskella and California Class members are "consumers" within the meaning of Civil Code §§ 1761(d) and 1770 and their purchases or leases of the Class Vehicles constitute a "transaction" within the meaning of Civil Code §§ 1761(e) and 1770.

202. Defendant's acts and practices, which were intended to result and which did result in the sale of Class Vehicles with the Engine Defect, violate § 1770

of the Consumers Legal Remedies Act for at least the following reasons:

        a.      Defendant represents that its vehicles had characteristics, uses, or benefits which they do not have;

        b.      Defendant advertises its goods with intent not to sell them as advertised;

        c.      Defendant represents that its vehicles are of a particular standard, quality, or grade when they are not; and

        d.      Defendant represents that a transaction conferred or involved rights, remedies, or obligations which they do not.

203.  As described above, Defendant sold the Class Vehicles to Plaintiff Miskella and California Class members but failed to disclose the Engine Defect, its attendant risks, and sudden catastrophic engine failure incidents at the point of sale, advertising materials, or otherwise. Defendant intended that Plaintiff Miskella and California Class members rely on this omission in deciding to purchase their vehicles.

204.  Had Defendant adequately disclosed the Engine Defect and the attendant safety risks at the point of sale and in advertising materials, Plaintiff Miskella, members of the California class, and reasonable consumers would have seen, heard, or learned about the disclosure and would not have purchased or leased the Class Vehicles or would have paid significantly less to buy or lease them.

205.   Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff Miskella, on behalf of himself and the California Class, at this time only seek injunctive relief. Plaintiff will notify Defendant in writing of the CLRA violations alleged herein prior to filing a complaint seeking damages. If Defendant does not exercise its opportunity to provide corrective action pursuant to Section 1782(b) within the time provided, Plaintiff Miskella will amend this complaint to seek damages and all other available relief.

206.   Pursuant to California Civil Code § 1780, Plaintiff Miskella seeks all available injunctive relief. Plaintiff Miskella and the proposed California Class members are entitled to an injunction enjoining Defendant's misconduct as alleged herein and directing Defendant to disclose the existence of the Engine Defect to all owners and lessees of the Class Vehicles and directing Defendant to provide an adequate repair. Plaintiff Miskella, California Class members, and members of the public will suffer irreparable injury if an injunction is not ordered as they are at risk of bodily injury. Plaintiff Miskella will also suffer irreparable injury if Defendant's misleading practices are not enjoined. Plaintiff Miskella has an interest in buying GM vehicles in the future, often sees marketing for GM's vehicles, and will consider purchasing GM's vehicles in the future if possible, but has no way of determining whether the vehicles are defective.

207.   Plaintiff Miskella brings this Claim for injunctive relief on behalf of

himself, and California Class members, and lacks adequate remedies at law. Plaintiff Miskella, California Class members, and members of the public are at risk of bodily injury, which is not redressed by money damages. Further, Defendant's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that the requested injunctions are designed to prevent.

### COUNT IX – VIOLATION OF THE CALIFORNIA SONG-BEVERLY CONSUMER PROTECTION ACT, BREACH OF IMPLIED WARRANTY (Cal. Civ. Code § 1791, *et seq.*) (Plaintiff Miskella on behalf of the proposed California Subclass)

208.   Plaintiff Miskella hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 97.

209.   Plaintiff Miskella brings this claim on behalf of the California Class.

210.   Class Vehicles are "consumer goods" and Plaintiff and California Class members are "buyers" within the meaning of Cal. Civ. Code § 1791. GM is also a "manufacturer," "distributor," or "retail seller" under Cal. Civ. Code § 1791.

211.   The implied warranty of merchantability included with the sale of each Class Vehicle means that GM warranted that each Class Vehicle (a) would pass without objection in trade under the contract description; (b) was fit for the ordinary purposes for which the Class Vehicle would be used; and (c) conformed to the promises or affirmations of fact made on the container or label.

212.   The Class Vehicles would not pass without objection in the automotive trade because of the Engine Defect, which also makes them unfit for the ordinary purpose for which a Class Vehicle would be used.

213.   The Class Vehicles are not adequately labeled because their labeling fails to disclose the Engine Defect and risk of sudden and catastrophic engine failure and loss of power and does not advise the members of the proposed California Class of the existence of the issue prior to experiencing failure firsthand.

214.   In addition to increased costs, GM's actions have deprived Plaintiff Miskella and California Class members of the benefit of their bargains and have caused Class Vehicles to be worth less than what Plaintiff Miskella and other California Class members paid.

215.   As a direct and proximate result of GM's breach of implied warranty, members of the proposed California Class received goods whose condition substantially impairs their value. Plaintiff Miskella and California Class members have been damaged by the diminished value of their Class Vehicles.

216.   Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiff Miskella and members of the proposed California Class are entitled to damages and other legal and equitable relief, including, at their election, the right to revoke acceptance of Class Vehicles or the overpayment or diminution in value of their Class Vehicles. They are also entitled to all incidental and consequential damages resulting from

GM's breach, as well as reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant and in favor of Plaintiffs and the Class, and award the following relief:

A.      An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class, and Plaintiffs' counsel as counsel for the Class;

B.      Injunctive and equitable relief in the form of a comprehensive program to adequately repair or replace the engines in all Class Vehicles, and/or buy back all Class Vehicles, and to fully reimburse and make whole all members of the Class for all costs and economic losses;

C.      Any other appropriate injunctive and equitable relief;

D.      An order awarding compensatory damages for economic loss, overpayment, and out-of-pocket costs in an amount to be determined at trial;

E.      An order awarding restitution, disgorgement, punitive damages, treble damages, and exemplary damages, as permitted under applicable law;

F.      An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded, as required by applicable law;

G.      An award of costs, expenses and attorneys' fees as permitted by law;

and

H.      Such other or further relief as the Court may deem appropriate, just,

and equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

by jury of any and all issues in this action so triable of right.

Respectfully submitted this 23rd day of May, 2025.

/s/ Scott A. George
Scott A. George
**SEEGER WEISS LLP**
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
Telephone: 215-564-2300
Facsimile: 215-851-8029
sgeorge@seegerweiss.com

Christopher A. Seeger
*(Pro hac vice forthcoming)*
**SEEGER WEISS LLP**
55 Challenger Road, Suite 600
Ridgefield, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 679-8656
cseeger@seegerweiss.com

Rosemary M. Rivas
*(Pro hac vice forthcoming)*
Rosanne L. Mah
*(Pro hac vice forthcoming)*
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100

Oakland, California 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
rmr@classlawgroup.com
rlm@classlawgroup.com

Brian E. Johnson
(*Pro hac vice forthcoming*)
**GIBBS LAW GROUP LLP**
211 N. Union St., Suite 100
Alexandria, Virginia 22314
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
bej@classlawgroup.com

*Attorneys for Plaintiffs*